## AMY BOWER ET AL. *v.* DAVID D'ONFRO ET AL.
### (12161)

LAVERY, HENNESSY and FREEDMAN, Js.

Argued January 12—decision released August 8, 1995

*Roger J. Frechette,* with whom was *Matthew E. Frechette,* for the appellants (defendant Bradley D. Ausmus et al.).

*Wesley W. Horton,* with whom were *Susan M. Cormier,* and, on the brief, *Anthony Nuzzo, Jr.,* and *Tanya Feliciano,* certified legal intern, for the appellees (plaintiffs).

LAVERY, J. The defendants Bradley D. Ausmus and Lin Ausmus appeal[1] from a judgment awarding money damages after a jury trial in an automobile negligence case. They claim that the trial court improperly (1) refused to permit testimony and evidence of the plaintiff's failure to wear a seat belt on the basis of General Statutes § 14-100a (c) (4), (2) applied the collateral sources statute to this case, (3) awarded prejudgment interest under the offer of judgment statute, General Statutes § 52-192a, (4) excluded judicial and evidentiary admissions, (5) permitted evidence of racing, and (6) found that there was sufficient evidence of negligence by the defendant to have proximately caused the accident. We affirm the judgment in part and reverse in part.

The jury could have reasonably found the following facts. The plaintiff Amy Bower was a passenger in a

---

[1] The case against the named defendant was settled prior to trial. As used in this opinion, the defendants refers to Bradley D. Ausmus and Lin Ausmus. The named plaintiff's father Edward K. Bower sought to recover for medical expenses incurred. As used in this opinion, the plaintiff refers to the named plaintiff.

car owned and operated by David V. D'Onfro. They were traveling west on Higgins Road in Cheshire at a high rate of speed when D'Onfro lost control, veered off the road into woods and smashed into a tree. The plaintiff was thrown through the open window on the driver's side of the vehicle onto the middle of the highway. The defendant Bradley Ausmus was driving at a high rate of speed close behind the D'Onfro vehicle. As Ausmus came to the top of a hill, he braked suddenly, skidded into the plaintiff and dragged her sixty-eight feet.

I

At trial, the trial court, pursuant to § 14-100a (c) (4), excluded any evidence that the plaintiff was not wearing a seat belt. Additional facts peculiar to each claim will be set forth in the discussion of each claim.

The defendants argue that the trial court's failure to permit evidence that the plaintiff failed to wear a seat belt deprived them of their constitutional rights. The defendants claim that because § 14-100a (c) (4) bars the testimony and evidence of the plaintiff's failure to wear a seat belt and because that failure impacts on the cause of the accident, on the plaintiff's negligence and on the defendant's negligence, the defendants were deprived of their constitutional rights to due process, to access to courts, to equal protection, against impermissible discrimination, and to a jury trial. We will address the constitutionality of § 14-100a (c) (4) both on its face and as applied in this case.

General Statutes § 14-100a (c) (4) provides: "Failure to wear a seat safety belt shall not be considered as contributory negligence nor shall such failure be admissible in any civil action."

We are bound by the principle that "[a] party who challenges the constitutionality of a statute 'bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality.' " *State* v. *Merdinger*, 37 Conn. App. 379, 382, 655 A.2d 1167 (1995). Also, the defendant must show that § 14-100a (c) (4) adversely affects a constitutionally protected right. *Society for Savings* v. *Chestnut Estates, Inc.*, 176 Conn. 563, 569, 409 A.2d 1020 (1979). Courts exercise their power to declare a statute unconstitutional " 'with caution and in no doubtful cases.' " *Fair Cadillac-Olds Isuzu Partnership* v. *Bailey*, 229 Conn. 312, 316, 640 A.2d 101 (1994). We uphold this statute as constitutional.

## A

The defendants' first claim is one of substantive due process. They argue that it was the plaintiff's failure to wear her seat belt that caused her injuries and not Bradley Ausmus' reckless driving. The defendants claim, therefore, that they cannot constitutionally be liable for the plaintiff's injuries because Ausmus did not cause her to be thrown from D'Onfro's vehicle.

The defendants' due process argument is based on their assertion that a defendant cannot be held liable for an injury when his conduct does not directly cause the injury. This argument ignores the fact that the legislature can assign statutory responsibility for certain injuries. *Starr* v. *Commissioner of Environmental Protection*, 226 Conn. 358, 627 A.2d 1296 (1993), for example, held that the plaintiff could not prevail on her claim that the legislature intended that the public treasury, rather than the landowner, be required to bear the cost of the cleanup of the contaminated property; the legislature could legitimately have determined that an owner's lack of culpability for the existence of

a contaminated condition was outweighed by the state's interest in protecting public resources. Therefore, the fact that the defendants claim that the statute would punish people who did not directly cause an injury does not make the statute irrational.

Even if we were to adopt the defendants' premise that a party must have caused an injury in order to be liable for damages, the defendants' definition of causation is unworkable. The plaintiffs alleged and presented evidence at trial to show that Bower's injuries were caused by the joint negligence of D'Onfro and Bradley Ausmus, which began before Bower was thrown from the D'Onfro vehicle. The plaintiffs showed that the conduct of Ausmus and D'Onfro was concurrently negligent, and that the defendants would be liable for Bower's injuries even had she not been thrown from the car. See *Tetro* v. *Stratford*, 189 Conn. 601, 605, 458 A.2d 5 (1983). In *Tetro*, our Supreme Court stated: " 'Proximate cause is ordinarily a question of fact. . . . The test for finding proximate cause "is whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence." . . . The foreseeable risk may include the acts of the plaintiff and of third parties.' " Id.

Despite the fact that the jury could reasonably have found that Ausmus was speeding, was driving recklessly, did not apply his brakes quickly enough, followed D'Onfro's vehicle too closely and failed to maintain a proper lookout, the defendants' position appears to be that it is irrational for the legislature to have abolished the seat belt defense, especially where the plaintiff is thrown from the vehicle. This issue was addressed in legislative debate. "The failure to wear a seat belt would be in no way involved in the issue of causation of the accident. The courts have clearly held that the failure to wear a seat belt doesn't cause the accident."

28 H.R. Proc., Pt. 23, 1985 Sess., pp. 8352, 8354, remarks of Representative Robert Farr.

Cases such as the present case were anticipated and addressed by the legislature. During the legislative debates, the possibility was discussed that a passenger could suffer an injury that he would not have suffered but for the failure to wear a seat belt. Id., p. 8354. It was made clear that the seat belt defense could not be raised in such a case. Id. Representative Farr stated that "[t]his amendment says . . . you can never raise that defense." Id. Clearly the legislature has decided not to allow arguments such as the defendants' to prevent redress for injured plaintiffs.

The legislature focused on the action of the driver, not on the use of a seat belt. The legislature in its debate went so far as to consider that a passenger or driver might have an accident, remove a seat belt, and lose consciousness. Such persons might be barred from seeking redress for damages sustained, a result that the legislature did not want. 28 H.R. Proc., Pt. 23, 1985 Sess., pp. 8343, 8348.

As the statute is not irrational, and the defendants were afforded a full and fair trial as to their liability, the defendants were not denied due process of law. Due process is denied when the legislature enacts a law that prescribes new or alters existing rules of evidence or prescribes methods of proof that altogether deny a party his or her constitutional rights. 29 Am. Jur. 2d, Evidence § 6 (1994). Eliminating the seat belt defense on the issue of causation did not preclude the defendants from making other defenses as to causation.

## B

The defendants' second claim is that § 14-100a (c) (4) deprived them of access to the courts in violation of

article first, § 10, of the Connecticut constitution.[2] They claim that § 10 preserved the right to defend against liability by showing contributory negligence and that § 14-100a (c) (4) closed the courts to the defendants by not allowing them to present the seat belt defense.

The defendants rely on *Gentile* v. *Altermatt*, 169 Conn. 267, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976), to prove that they were deprived of access to the courts. *Gentile* holds that "[t]he adoption of article first, § 10, recognized all existing rights and removed from the power of the legislature the authority to abolish those rights in their entirety. Rather, the legislature retains the power to provide reasonable alternatives to the enforcement of such rights." Id., 286. There are three flaws in the defendants' argument.

First, there has never been an established common law duty to wear a seat belt in Connecticut. Prior to the enactment of § 14-100a (c) (4), Superior Court decisions were split as to the duty to wear a seat belt. As there is no common law duty, the defendants cannot claim that they have been deprived of a common law right.

Second, because § 10 preserved only those rights that existed in 1818, the defendants have to prove that contributory negligence existed as an established defense in 1818. Although there was an English case that addressed this issue in 1809, it was not until 1824 that there was an American case in Massachusetts. W. Keeton & W. Prosser, Torts (5th Ed. 1984) § 65, p. 451 n.1. There was no case in Connecticut on this issue until 1844. *New-Haven Steam-Boat & Transportation Co.* v.

---

[2] Article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

*Vanderbilt,* 16 Conn. 420, 429–30 (1844); see also *Beers* v. *Housatonic Railroad Co.,* 19 Conn. 566, 575 (1849); cf. *Carpenter* v. *Meachum,* 229 Conn. 193, 640 A.2d 591 (1994).

Third, *Gentile* does not apply § 10 to a defense. Because of the no-fault law, the plaintiffs in *Gentile* were completely barred from bringing a cause of action. Yet, in the present case, the statute did not bar the defendant from bringing a cause of action, but from presenting a defense. Despite § 14-100a (c) (4), the defendants were left with reasonable alternative defenses. Because the defendants had alternative defenses, they cannot claim that their § 10 right to defend liability was impaired by the legislature. Therefore § 14-100a (c) (4) does not conflict with *Gentile* and the defendants' access to the courts under article first, § 10, was not hindered.

## C

The defendants third claim is that § 14-100a (c) (4) violates their equal protection rights under the Connecticut constitution and the United States constitution.[3] They argue that the statute distinguishes between plaintiffs and defendants and deprives the defendants of property and money without a compelling state interest.

This court must first determine the appropriate constitutional standard to apply to this equal protection claim. The defendants argue that their claim deserves strict scrutiny because § 14-100a (c) (4) interferes with

[3] Article first, § 20, of the Connecticut constitution provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin or sex."

The fourteenth amendment to the United States constitution provides in relevant part: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

their fundamental right of access to the courts. Strict scrutiny is not the appropriate standard for three reasons. First, § 10 does not confer a fundamental right that merits strict scrutiny. *Ryskiewicz* v. *New Britain*, 193 Conn. 589, 597–98, 479 A.2d 793 (1984). Second, the defendants have not been denied the fundamental right of access to the courts, as discussed previously. Third, the defendants have failed to identify any suspect class against which § 14-100a (c) (4) discriminates. The defendants in this case were treated no differently than any other similarly situated defendant would have been because all defendants are barred under the statute from presenting the seat belt defense. The group identified by the defendants is not the sort of "discrete and insular" minority for whom strict scrutiny is necessary to uphold its rights. *Graham* v. *Richardson*, 403 U.S. 365, 372, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971). "If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge." *Ryskiewicz* v. *New Britain*, supra, 597. State action concerning social and economic regulation, with some exceptions will survive an equal protection challenge if it satisfies a rational basis test. *Daly* v. *DelPonte*, 225 Conn. 499, 513, 624 A.2d 876 (1993). Therefore, the defendants claim merits rational basis review.

Under rational basis review, this court may not sit " 'as a superlegislature to judge wisdom or desirability or legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . . .' " *Blue Sky Bar, Inc.* v. *Stratford,* 203 Conn. 14, 27, 523 A.2d 467 (1987), quoting *New Orleans* v. *Duke,* 427 U.S. 297, 303–304, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976). Instead " '[t]his strong presumption of legislative validity is overcome only

when it plainly appears that the terms of the legislation are not reasonable or that they are not rationally adapted to the promotion of public health, safety, convenience, or welfare. . . .' The party challenging the enactment bears the burden of overcoming this presumption." (Citations omitted.) Id., 24. The defendants have not met this burden and it has already been demonstrated in the previous discussion of due process that this statute is rationally related to a legitimate state purpose. The equal protection clause of neither the federal nor state constitution has been violated by § 14-100a (c) (4).

## D

The defendants' fourth claim is that § 14-100a (c) (4) interferes with the right to a trial by jury under article first, § 19,[4] of the Connecticut constitution because the statute bars the seat belt defense. In interpreting § 19, our Supreme Court has held "that the right to a jury trial exists both in cases in which it existed at common law at the time of the adoption of the constitutional provisions preserving it and in cases substantially similar thereto." *Ford* v. *Blue Cross & Blue Shield of Connecticut, Inc.*, 216 Conn. 40, 50, 578 A.2d 1054 (1990); *Spitzer* v. *Haims & Co.*, 217 Conn. 532, 539–41, 587 A.2d 105 (1991). Our Supreme Court also found that there is the right to protect the jury trial from procedural changes that in fact change the substance of the jury institution. *Ford* v. *Blue Cross & Blue Shield of Connecticut, Inc.*, supra, 49–53. The defendants have not successfully argued a violation of either of these rights.

The first part of the defendants' claim is that their right to have questions of fact resolved by a jury was interfered with. As there is no right to present facts

---

[4] Article first, § 19, of the Connecticut constitution provides: "The right of trial by jury shall remain inviolate."

to a jury on a defense not recognized by law, the defendants appear to be making the argument that the seat belt defense is a legal defense. In *Caciopoli* v. *Acampora*, 30 Conn. App. 327, 620 A.2d 191 (1993), a defense recognized by law was at issue; the case at hand is distinguishable as the defense is not recognized by law. The second part of the defendants' claim is that § 14-100a (c) (4) interfered with a procedural aspect of their right to a jury trial. When the trial court excluded Bower's failure to wear a seat belt it was not a "summary decision," but instead the trial court was simply complying with the clear mandate of § 14-100a (c) (4). In conclusion, there is no violation of the defendants' article one, § 19 rights because there was no interference with the jury's fact-finding function or the substance of the jury trial.

## II

The defendants' second claim concerns collateral source payments and tort reform. The defendants' first claim is that the $400,000 the plaintiffs received from D'Onfro is a collateral source payment that must be deducted from any recovery received by the plaintiffs. The jury rendered an award of $1,000,000 and apportioned liability, finding D'Onfro 50 percent negligent and Ausmus 50 percent negligent. Under General Statutes § 52-225a, the defendants claim that the collateral source setoffs are deducted from their percentage of the award rather than the whole award. We disagree.

The procedural facts surrounding the collateral source issue are as follows. The plaintiffs brought this action against David D'Onfro, the driver of the vehicle in which the plaintiff was riding, Bradley Ausmus, the driver of the vehicle that hit the plaintiff as she lay in the road, and Lin Ausmus, the owner of the vehicle driven by Bradley Ausmus. Prior to trial, the plaintiffs settled their claim against D'Onfro for $400,000. The

case proceeded to a trial before a jury against the remaining defendants, Bradley Ausmus and Lin Ausmus. The jury returned a verdict of $1,000,000, finding Bradley Ausmus to be 50 percent negligent and D'Onfro to be 50 percent negligent.

Following the jury's verdict, the defendants argued that the $400,000 settlement, as well as $43,345.10 received by the plaintiffs for payment of medical bills, should be deducted from the $500,000 verdict rendered against them. The trial court concluded that the $400,000 settlement payment should not be considered as a collateral source and that the $43,345.10 medical payment should be deducted from the $1,000,000. Specifically, the trial court held that, although Tort Reform I; General Statutes (Rev. to 1987) § 52-225b; seemed to require the court to deduct settlement payments as a collateral source, the legislature amended § 52-225b with the enactment of Public Acts 1987, No. 87-227, § 5 (Tort Reform II), which excluded amounts received as a settlement from the definition of a collateral source.[5] Section 52-225b was amended in Tort Reform II. The trial court further concluded that the public act was passed to clarify an existing statute and should be applied retroactively. As the trial court noted in *Turner* v. *Turner*, 219 Conn. 703, 717, 595 A.2d 297 (1991): "According to well established principles of statutory construction, an amendment that construes and clarifies a prior statute operates as the legislature's declaration of the meaning of the original act. . . . If an amendment is enacted soon after controversies arise

[5] Under Tort I, General Statutes (Rev. to 1987) § 52-225b defined collateral sources to be "any payments made to the claimant, or on his behalf, (1) by any person as compensation for personal injury or wrongful death attributable to the incident giving rise to the cause of action . . . ." General Statutes (Rev. to 1989) § 52-225b, as amended by Public Acts 1987, No. 87-227, § 5, provides that " '[c]ollateral sources' do not include amounts received by a claimant as a settlement."

regarding the interpretation of the prior act, it is logical to regard the amendment as a legislative interpretation of the original act . . . ." (Citations omitted; internal quotation marks omitted.) Therefore, "an act that has been passed to clarify an existing statute . . . is . . . to be applied retroactively." *Rudewicz* v. *Gagne*, 22 Conn. App. 285, 288, 582 A.2d 463 (1990). The trial court, therefore, refused to deduct the $400,000 payment as a collateral source. We agree with the well reasoned decision of the trial court in applying Tort Reform II and *Turner* v. *Turner*, supra, 703, in finding that settlements are not collateral source payments and we adopt its findings and reasoning as set forth above.

The trial court deducted the $43,346.10 in medical payments from the $1,000,000 jury verdict, rather than from the defendants' $500,000 proportionate share, leaving a balance of $956,653.90. The trial court then rendered judgment against the Ausmus defendants in the amount of $478,326.95, representing their 50 percent proportional negligence. We agree, subject to the economic damage finding hereinafter set forth.

*Fleming* v. *Garnett*, 231 Conn. 77, 646 A.2d 1308 (1994), a case recently decided by our Supreme Court, is directly on point on the issue of deducting the collateral source from the total award. *Fleming* holds that the trial court, in interpreting § 52-225, properly applied the net collateral source reduction to the total amount of damages determined by the jury rather than to a proportionate share. This interpretation of the statute comes from the Supreme Court's well established principles of statutory construction. The Supreme Court has said: "Our fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to

the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omitted.) Id., 91–92.

With these principles of statutory construction in mind, our Supreme Court examined the defendant's claim in *Fleming*. Section 52-225a provides that the net collateral source reduction must be applied to the "damages . . . awarded to compensate the claimant." The defendant asserted that the term "award," as used in this context, means the defendant's proportionate share of the recoverable damages. The court found no support for this reading of the statute and found that the challenged language, "which contains no express qualification of the amount of the award, supported the trial court's application of the collateral source reduction to the total damages found by the jury." *Fleming* v. *Garnett*, supra, 231 Conn. 92.

"Subsequent revisions to the collateral source reduction provision of Tort Reform I comport with our [Supreme Court's] construction. Section 52-225a was revised effective October 1, 1987, by No. 87-227 of the 1987 Public Acts (Tort Reform II), for the purpose of clarifying the manner in which the collateral source reduction and other offsets are to be applied in the calculation of a claimant's recoverable damages. See, e.g., 30 H.R. Proc., Pt. 16, 1987 Sess., p. 5664, remarks of Representative Richard D. Tulisano. Under Tort Reform II, when 'damages are awarded to compensate the claimant, the court shall reduce the amount of such award which represents economic damages, as defined in subdivision (1) of subsection (a) of section 52-572h . . . .' General Statutes (Rev. to 1993) § 52-225a." Id., 92–93. According to our Supreme Court, the current statute defines " 'award' in terms of a claimant's total loss, as opposed to the liability assessed against any partic-

ular defendant." Id., 93. Therefore, the Supreme Court concluded that the collateral source reduction of § 52-255a should be applied against the total damages found by the jury necessary to compensate the plaintiff.

The defendants also dispute the jury award of $100,000 to Bower for past economic damages and challenge the accuracy of the $43,346.10 in medical payments that the trial court did set off as a collateral source payment.

The defendants contend that past due economic damages do not amount to $100,000, but instead amount to $65,019.40, a sum not disputed by the plaintiff. General Statutes § 52-572h (a) defines economic damages as "(1) . . . compensation determined by the trier of fact for pecuniary losses including, but not limited to, the cost of reasonable and necessary medical care, rehabilitative services, custodial care and loss of earnings or earning capacity excluding any noneconomic damages; (2) 'noneconomic damages' means compensation determined by the trier of fact for all nonpecuniary losses including, but not limited to, physical pain and suffering and mental and emotional suffering . . . ." Therefore, the economic damages should be reduced from $100,000 to $65,019.40, the amount actually spent or owed that was proven and conceded by both parties.

As for the medical payments, there is no dispute that the plaintiffs received $43,346.10 from Blue Cross and Blue Shield. That is the only amount "paid for the benefit of the claimant." General Statutes § 52-225a (b). Nothing in § 52-225b that defines collateral sources authorizes a further reduction as claimed by the defendants. The trial court properly deducted the $43,346.10 in medical insurance payments from the $1,000,000 award and divided that amount by two, to arrive at a net figure of $478,326.95. This approach follows § 52-225a, which directs the court to "reduce the

amount of such award" by collateral source payments to the claimant. "Such award" refers to the "damages awarded to compensate the claimant" by the trier of fact. In this case, the jury found the plaintiff's damages to be $1,000,000.

The trial court properly applied the collateral source statute in determining both the appropriate reductions and method of calculating the net figure for which the defendants were responsible, but it should have reduced the economic damages to the amount actually proven, $65,019.40. The entire jury award should, therefore, have been reduced to $965,019.40. After deducting the medical payments received by the plaintiffs and dividing that amount by two, the judgment against Lin and Bradley Ausmus should have been $460,836.65.

### III

The defendants' third claim concerns an offer of judgment pursuant to § 52-192a. The issue is whether the plaintiffs' verdict of $500,000 against the Ausmuses should be increased by 12 percent annual interest on that amount.

On February 14, 1990, pursuant to Practice Book § 346, the plaintiffs filed the following offer of judgment. "The plaintiffs, Amy Bower and Edward K. Bower, pursuant to § 346 of the Connecticut Practice Book, offer to stipulate the judgment against all Defendants for the sum of $700,000. This offer is subject to the following conditions: 1. That the Defendant, David V. D'Onfro, pay the sum of $400,000; 2. That the Defendants Bradley D. Ausmus and Lin Ausmus pay the sum of $300,000; and 3. That an offer of less than the sum of $700,000 from any Defendant shall not be accepted by the Plaintiffs."

The defendants moved to strike the offer of judgment and the plaintiffs filed an amended offer of judgment

which read as follows: "The plaintiffs in the above-entitled action, pursuant to Practice Book Section 346 et seq. and C.G.S. Section 52-192a, hereby offer to take judgment of the Defendants in the amount of SEVEN HUNDRED THOUSAND and 00/100 ($700,000.00) Dollars." The motion to strike was never heard or decided. The only offer of judgment by the plaintiffs before the trial court was the amended offer. Subsequent thereto, the defendant David V. D'Onfro on June 6, 1990, filed an offer of judgment, which read as follows: "The undersigned defendant hereby offers to settle the claim underlying this action and stipulate to a judgment in the amount of Four Hundred Thousand ($400,000) Dollars without interest or costs to either party."

The offer of judgment was accepted and the judgment was entered by the court on March 12, 1992, under the following terms: "Judgment shall enter on behalf of the plaintiffs, Amy Bower and Edward K. Bower as against the defendant, David D. D'Onfro, aka David V. D'Onfro in the amount of three hundred thousand dollars ($300,000); judgment shall further enter on behalf of the plaintiffs, Amy Bower and Edward K. Bower, in the amount of one hundred thousand dollars ($100,000) as against the defendant David D. D'Onfro, aka David D'Onfro. (Case still open against the defendants Bradley Ausmus and Lin Ausmus.)" The May 12, 1992 memorandum filed by the plaintiffs concedes that the offer of judgment was accepted by the plaintiffs.

The plaintiffs, pursuant to Practice Book §§ 345 through 350 and General Statutes § 52-192a,[6] filed a

---

[6] General Statutes § 52-192a (b) provides in pertinent part: "After trial the court shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in his 'offer of judgment', the court shall add to the amount so recovered twelve per cent annual interest on said amount . . . ."

motion to compute interest on the verdict. The defendants, Lin Ausmus and Bradley Ausmus, objected to the plaintiffs' motion on the grounds that the plaintiffs' amended offer of judgment was for $700,000 and was indivisible. The defendants further stated that after the plaintiffs settled a portion of the case with D'Onfro, the plaintiffs did not file a new offer of judgment. The defendants than argued that the plaintiffs therefore did not recover an amount equal to or greater than the amount in the offer of judgment because the judgment rendered against the Ausmuses is less than the $700,000 offer of judgment.

The trial court overruled the defendants' objection and found that the plaintiffs were entitled to the 12 percent interest. The trial court reasoned that as the amended offer reflected the sum of the initial figures as a total potential liability of all defendants and § 52-192a precluded the plaintiffs from filing a second offer of judgment after the claims against D'Onfro were settled, the most equitable solution necessitated dividing the offer equally between the two sets of defendants and, therefore, determined that the offer of judgment against the Ausmus defendants was $350,000. The court concluded that because the jury award of $500,000 against the Ausmuses was greater than the $350,000, the plaintiffs were entitled to interest on the $500,000 award. We disagree with the trial court as there is no authority to divide the $700,000 between the two sets of the defendants, and the plaintiffs are bound by the $700,000 amended offer of judgment.

*Civiello* v. *Owens-Corning Fiberglass Corp.*, 208 Conn. 82, 90, 544 A.2d 158 (1988), holds that it is a judgment, not a verdict, that controls under § 52-192a (b). In *Civiello,* our Supreme Court stated, "The issue turns upon whether the term 'recovered' in the statute refers to the verdict as returned by jury or the judgment thereon as rendered by the court . . . ." Id. Therefore,

we hold that the judgment that the plaintiffs received in the present proceeding against the Ausmuses must exceed $700,000 in order to satisfy § 52-192a (b).

In the case at hand the jury returned a verdict of $1,000,000 and apportioned liability, finding D'Onfro 50 percent negligent and the Ausmuses 50 percent negligent. The trial court then properly deducted the $43,346.10 in medical insurance payments from the $1,000,000 award, divided that figure by two and rendered a judgment of $478,326.95 against the Ausmuses. The $478,326.95 judgment is not in excess of the $700,000 offer of judgment nor is the corrected judgment of $460,836.65. The statute does not apply and the verdict should not be increased by 12 percent annual interest. Therefore, the trial court improperly applied the offer of judgment statute, § 52-192a, and we reverse that part of the judgment.

## IV

The defendants' fourth claim has two elements. The defendants first claim it was improper to preclude them from inquiring into the settlement between the plaintiffs and David D'Onfro. Second, the defendants claim that the plaintiff's evidential and judicial admissions were admissible.

## A

As to the claims regarding settlement, § 52-216a prohibits such testimony. The plaintiffs filed a motion to preclude the defendants from "mentioning, commenting on, questioning about, or inquiring into the settlement of any claim between the plaintiffs and David V. D'Onfro." The defendants filed an objection to the plaintiffs' motion concerning § 52-216a. The defendants claim that § 52-216a does not prohibit them from asking the plaintiffs if they had sued another tortfeasor, and if, as a result of that complaint, they had obtained a monetary recovery.

The defendants' claim ignores the plain language of § 52-216a, which provides that an agreement not to sue or a release "shall not be read to a jury or *in any other way introduced into evidence* by either party . . . ." (Emphasis added.) Section 52-216a "was intended to ensure that jury verdicts would not be influenced by the knowledge of a partial settlement." *Civiello* v. *Owens-Corning Fiberglass Corp.*, supra, 208 Conn. 93; *Belanger* v. *Village Pub I, Inc.*, 26 Conn. App. 509, 514, 603 A.2d 1173 (1992). Therefore the trial court properly excluded any evidence of the settlement.

## B

The defendants also claim that the judicial admissions should have been allowed in as evidence. On March 9, Bradley Ausmus filed a memorandum in support of his offer that the prior complaints were admissible as evidential admissions and the current complaint as a judicial admission. The trial court prohibited Bradley Ausmus from inquiring of the plaintiff as to her evidential and judicial admission that appears in paragraph six of the original complaint. Paragraph six provides: "Suddenly, the defendant, David V. D'Onfro so steered, controlled and operated the course of movement of the vehicle he was driving so as to leave the travel portion of the road, skidding sideways and then turning completely over in mid air, *causing the plaintiff*, Amy Bower, *to be ejected from the vehicle and thrown into the east bound lane* resulting in her being run over by the vehicle operated by the defendant [Bradley Ausmus] . . . ." (Emphasis added.) The Ausmuses believe that this admission is critical to Bradley Ausmus' case and it is the same as his claim of nonnegligence. It is the Ausmuses' claim that D'Onfro caused the plaintiff to be ejected from the vehicle and that D'Onfro caused her to be thrown into the eastbound lane, which caused and resulted in her being run over by the vehicle operated by Bradley Ausmus. It is this admission by the plaintiff that the Ausmuses wanted to bring to the jury's attention,

and to inquire of her as to that issue, to which she testified that she has no knowledge. The amended substitute complaint, which was submitted to the jury, contained the identical allegation making it a judicial admission as to causation, as to fault, and as to a lack of, or freedom from, negligence by the Ausmuses.

The trial court was incorrect in excluding judicial and evidential admissions in the pleadings. "Statements in pleadings that are inconsistent with claims advanced at trial are admissible as judicial admissions." *Schenck v. Pelkey*, 176 Conn. 245, 248, 405 A.2d 655 (1978). In *Schenck*, the original complaint against the Pelkeys was introduced into evidence as a judicial admission on the issue of proximate cause. The defendants acknowledge that the amended substitute complaint contained the precise allegations that the defendants claim they were prohibited from presenting to the jury. As the judicial admissions were actually admitted, the error is harmless, as their admission would be cumulative.

## V

The defendants' fifth claim is that the term "racing" should not have been used. The trial court permitted two of the plaintiffs' witnesses to utilize the term racing in their testimony. The defendants' objection is based on the fact that the complaint contains no allegation of racing pursuant to General Statutes § 14-224.[7]

---

[7] General Statutes § 14-224 provides: "EVASION OF RESPONSIBILITY IN OPERATION OF MOTOR VEHICLES. RACING. REQUIRED REMOVAL OF MOTOR VEHICLE FROM TRAVELED PORTION OF HIGHWAY. (a) Each person operating a motor vehicle who is knowingly involved in an accident which causes serious physical injury, as defined in section 53a-3, to or results in the death of any other person shall at once stop and render such assistance as may be needed and shall give his name, address and operator's license number and registration number to the person injured or to any officer or witness to the death or serious physical injury of any person, and if such operator of the motor vehicle causing the death or serious physical injury of any person is unable to give his name, address and operator's license number and registration number to the person injured or to any witness or officer, for

The plaintiffs denied making any claim of racing in violation of that statute. Rather, the plaintiffs alleged that Bradley Ausmus, in operating his vehicle at a high rate of speed, was both negligent and reckless. One of the plaintiffs' witnesses testified, "I seen two cars driving very fast and both of them were weaving across the yellow line like racing sort of, you know." He later defined what he meant by racing, "Going too fast, like I said, weaving, going like as if to pass." This testimony was relevant as tending to prove both speed and recklessness. Lay opinion on such matters has long been held admissible in Connecticut. *Squires* v. *Reynolds*, 125 Conn. 366, 5 A.2d 877 (1939); C. Tait & J. LaPlante, Connect-

---

any reason or cause, such operator shall immediately report such death or serious physical injury of any person to a police officer, a constable, a state police officer or an inspector of motor vehicles or at the nearest police precinct or station, and shall state in such report the location and circumstances of the accident causing the death or serious physical injury of any person and his name, address, operator's license number and registration number.

"(b) Each person operating a motor vehicle who is knowingly involved in an accident which causes physical injury, as defined in section 53a-3, to any other person or injury or damage to property shall at once stop and render such assistance as may be needed and shall give his name, address and operator's license number and registration number to the person injured or to the owner of the injured or damaged property, or to any officer or witness to the physical injury to person or injury or damage to property, and if such operator of the motor vehicle causing the physical injury of any person or injury or damage to any property is unable to give his name, address and operator's license number and registration number to the person injured or the owner of the property injured or damaged, or to any witness or officer, for any reason or cause, such operator shall immediately report such physical injury of any person or injury or damage to property to a police officer, a constable, a state police officer or an inspector of motor vehicles or at the nearest police precinct or station, and shall state in such report the location and circumstances of the accident causing the physical injury of any person or the injury or damage to property and his name, address, operator's license number and registration number.

"(c) No person shall operate a motor vehicle upon any public highway for a wager or for any race or for the purpose of making a speed record.

"(d) Each person operating a motor vehicle who is knowingly involved in an accident on a limited access highway which causes damage to property only shall immediately move or cause his motor vehicle to be moved

icut Evidence (2d Ed. 1988) § 7.15.3. When viewed in context, the witness' use of the word racing appears to have been simply to describe the speed and manner in which Bradley Ausmus and D'Onfro were driving. Neither he nor anyone else testified that they were engaged in a contest and therefore racing within the context of § 14-224.

Since the testimony was relevant to the allegations in the complaint and involved only violations actually alleged, the trial court properly refused to strike the witness' use of the word racing.

## VI

The defendants' sixth and final claim is insufficiency of the evidence. On the basis of the evidence presented at trial, the jury could have reasonably found the following: The posted speed limit for the road on which the accident occurred was twenty-five miles per hour. The Ausmus vehicle was closely following the D'Onfro vehicle in which the plaintiff was a passenger. Both cars were going at high rates of speed weaving back and forth across the yellow line trying to pass each other. The accident occurred after Bradley Ausmus came over the

---

from the traveled portion of the highway to an untraveled area which is adjacent to the accident site if it is possible to move the motor vehicle without risk of further damage to property or injury to any person.

"(e) No person who acts in accordance with the provisions of subsection (d) of this section may be considered to have violated subsection (b) of this section.

"(f) Any person who violates the provisions of subsection (a) of this section shall be fined not more than five thousand dollars or be imprisoned not less than one year nor more than five years or be both fined and imprisoned.

"(g) Any person who violates the provisions of subsection (b) or (c) of this section shall be fined not less than seventy-five dollars nor more than six hundred dollars or be imprisoned not more than one year or be both fined and imprisoned, and for any subsequent offense shall be fined not less than one hundred dollars nor more than one thousand dollars or imprisoned not more than one year or be both fined and imprisoned."

crest of a hill. At the top of that hill there was a blind spot. Bradley Ausmus admitted to driving at forty-five miles per hour at the blind spot. Just prior to the impact, he was driving fifty-two to sixty miles per hour. Had he been driving at the posted speed limits of twenty-five miles per hour, he would have had sufficient time to stop prior to hitting the plaintiff as she lay in the road. Instead, he jammed on his brakes, lost control of his vehicle, and skidded into the plaintiff and dragged her sixty-eight feet.

Applying the trial court's charge on proximate and concurrent cause to the evidence, the jury could have reasonably concluded that the defendants were liable for the injuries sustained by the plaintiff. *Bielaska* v. *Waterford,* 196 Conn. 151, 156, 491 A.2d 1071 (1985); *Pagani* v. *BT II, Ltd. Partnership,* 24 Conn. App. 739, 592 A.2d 397, cert. dismissed, 220 Conn. 902, 593 A.2d 968 (1991).

The judgment is reversed in part and the case is remanded with direction to render a judgment of $460,836.85 without any prejudgment interest.

In this opinion the other judges concurred.