[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: PLAINTIFF'S MOTION FOR APPROVAL OF JUDGMENTFILE AND DEFENDANTS' OBJECTION TO MOTION FOR APPROVAL OF JUDGMENT FILE
The parties dispute whether the defendants' liability is to be fixed under the common law rule of joint and several liability or the statutory rules of proportionate liability. The parties also dispute whether the jury award of $2,315,000.00 should be reduced by $1,300,000.00, which is the amount of a settlement that the plaintiff made with a party prior to trial. The resolution of these issues requires this court to determine the applicability to this case of various provisions of No. 86-338 of 1986 Public Acts (Tort Reform I) and No. 87-227 of 1987 Public Acts (Tort Reform II). For the reasons stated below, this court determines that the apportionment rules apply and that the definition of "collateral sources" that appears in Tort Reform II applies. Accordingly, this court concludes the award should not be reduced by the settlement and that each of the two defendants is liable to the extent of $405,125.00.
Plaintiff Steven A. Ayres is the guardian of the Estate of Alissa A. Nash. He brought suit on behalf of Alissa against Doctor Jesus Yap, Jr., Doctor Karl Alcan, and St. Joseph's Medical Center claiming that the negligence of the three defendants caused Alissa to suffer irreversible heart disease. Prior to trial, the CT Page 6639 plaintiff entered into a settlement agreement with St. Joseph's Medical Center. At trial, the plaintiff presented evidence showing that Alissa was born with a heart defect that eventually lead to pulmonary vascular disease. The disease has limited, and will continue to limit, Alissa's ability to enjoy life and will result in Alissa dying in her teens or early twenties. With proper diagnosis, Alissa's heart defect would have been timely corrected so that she would not have developed pulmonary vascular disease. The disease is now irreversible. Doctors Yap and Alcan committed malpractice in the performance and interpretation of echocardiograms; they failed to diagnose the heart defect.
In response to written interrogatories, the jury found that both Dr. Karl Alcan and Dr. Jesus D. Yap failed to exercise that degree of care, skill and diligence toward Alissa Nash which was required by the standard of care and that the failure of each doctor proximately caused Alissa Nash to suffer harm. The jury also found that the clinic doctors at St. Joseph's Medical Center failed to exercise the degree of care, skill and diligence that was required by the standard of care and that their failure proximately caused Alissa to suffer harm. The jury found future economic damages to be $665,000.00, past non-economic damages to be $150,000.00, and future non-economic damages to be $1,500,000.00. The total of these sums is $2,315,000.00. With respect to responsibility, the jury found Dr. Alcan's percentage of responsibility to be seventeen and one-half, Dr. Yap's percentage to be seventeen and one-half, and the hospital's percentage to be sixty-five percent. Plaintiff Steven A. Ayres contends defendant Jesus Yap, Jr., M.D. and defendant Karl Alcan, M.D. are liable for the full amount of the award under the common law rule of joint and several liability. The defendants, on the other hand, contend the total award must be reduced by the settlement, which the plaintiff made with the hospital, and that responsibility for the reduced award must be apportioned under the provisions of Tort Reform I.
The plaintiff argues that the apportionment rules of Tort Reform I do not apply to this case because Alissa's injury occurred between October 1, 1986, and October 1, 1987, and her cause of action accrued after October 1, 1987. These dates are based on findings made by the jury in response to interrogatories, which were submitted to the jury in order to obtain information needed to determine the applicability of various provisions of Tort Reform I and Tort Reform II. The jury found that neither Dr. Alcan nor Dr. Yap violated the standard of care before October 1, 1986. The jury found that Alissa suffered harm as a consequence of the conduct of CT Page 6640 Doctors Alcan and Yap between October 1, 1986, and October 1, 1987; it found the injury occurred between October 1, 1986, and October 1, 1987. The jury found that Alissa's caretaker discovered, or in the exercise of reasonable care should have discovered, the causal connection between Alissa's injuries and the negligent conduct of Doctors Alcan and Yap after October 1, 1987.
The plaintiff's argument is as follows: Tort Reform I became effective on October 1, 1986. Section 3(c) of 1986Public Acts No. 86-338 permits a jury to apportion damages among tortfeasors "in a negligence action to recover damages for personal injury . . .accruing on or after the effective date of this act . . . ." (emphasis added). The plaintiff's cause of action accrued after the effective date of Tort Reform I.[1] However, Tort Reform I was repealed by Tort Reform II. The "new statute" permits apportionment "in a negligence action to recover damages for personal injury . . . occurring on or after October 1, 1987." Gen. Stat. § 152-572h (emphasis added). The injury to Alissa Nash occurred before October 1, 1987. Because her injury occurred before October 1, 1987, Tort Reform II does not apply. Neither Tort Reform I nor Tort Reform II applies to the facts of this case. Therefore, the court must revert to the common law and find the defendants jointly and severally liable for Alissa Nash's injuries. Under the plaintiff's interpretation of the law, the defendants are jointly and severally liable for $2,315,000.00 in damages.
The defendants contend the plaintiff's argument is illogical and contrary to the intent of the legislature, which was expressed in two successive sessions, to abolish the rule of joint and several liability. The defendants argue that if two constructions of a statute are possible, courts will use the one that makes the statute effective and workable, not the one that leads to difficult and possibly bizarre results. They claim Tort Reform I applies to this case. Under the defendants' interpretation, they are each liable for $405,125.00.
The plaintiff's construction of the 1986 act and the 1987 act is based on a literal interpretation of the statutes. "Generally, [w]hen a statute's words are plain and unambiguous, we look no further for interpretive guidance because we assume the words themselves express the legislature's intent . . . . That axiom only applies in full force, however, [w]here . . . the language of the statute is . . . absolutely clear on its face and where noambiguity is raised in applying the statute in a particular case. . . . [Conversely,] when we are confronted with ambiguity in a CT Page 6641 statute, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designated to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; emphasis added; internal quotation marks omitted.) Sagamore Group,Inc. v. Commissioner of Transportation, 29 Conn. App. 292, 300,614 A.2d 1255 (1992). The application of the apportionment sections of the 1986 and 1987 acts to this case raises an ambiguity in the statutes. Clearly, the legislature intended to replace the common law doctrine of joint and several liability with rules providing for the apportionment of liability among responsible persons or parties. When the legislature passed Tort II, it intended to correct the flaws in Tort Reform I. Surely, the legislature could not have intended to suspend the application of the apportionment rules for cases where the injury occurred after the enactment of Tort Reform I but was discovered after the enactment of Tort Reform II. The court concludes that the defendants' liability is to be apportioned. Whether the liability is apportioned under Tort Reform I or Tort Reform II will not make a difference in the plaintiff's net award in light of the court's resolution of the next issue.
The next issue which must be resolved is whether the settlement with the hospital is a collateral source which must be deducted from the award. The parties have dwelt on the meaning of the words "accruing" and "occurring" as used in the 1986 and 1987 acts to describe the effective date of the apportionment rules. Tort Reform I and Tort Reform II also changed rules relating to the deduction of collateral sources from an award of damages. Tort Reform I amended 1985 Public Acts No. 85-874 by defining "collateral sources" as including payments "by any person as compensation for personal injury or wrongful death attributable to the incident giving rise to the cause of action . . . ." See § 5 of No. 86-338 of 1986 Public Acts. Tort Reform II deleted the quoted phrases from the definition of "collateral sources" and thereby specifically excluded amounts received as a settlement. See § 5 of No. 87-227 of 1987 Public Acts. The definitional change that appears in Tort Reform II is not restricted in application to injuries "occurring" after the effective date of the 1987 act. Thus, the question arises: is the new definition of "collateral sources" applicable to cases where the injury occurred between October 1, 1986 and October 1, 1987? Yes, according to the holding of Bower v. D'Onofro, 38 Conn. App. 685, 696-701, 663 A.2d 1061, certification denied 235 Conn. 911, 665 A.2d 606, certification CT Page 6642 denied 235 Conn. 912, 665 A.2d 606 (1995).[2] Since the new definition applies, the plaintiff's settlement with the hospital should not be deducted from the jury's award.
The plaintiff is requested to draft a judgment file that reflects the foregoing rulings and to submit the draft to the clerk and a copy to opposing counsel. Upon the court's approval of the draft, judgment will enter with notification to counsel.
THIM, JUDGE