[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION TO SET ASIDE THE VERDICT, MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND MOTION FOR REMITTITUR AND COLLATERAL SOURCE REDUCTION
The defendant, Howard I. Hochman, has moved to set aside the jury's verdict rendered after a trial in this medical malpractice action, in which the plaintiff, Neil Lanier, a minor child, claimed that the defendant's negligence caused him to suffer severe, disabling and permanent injuries. The defendant has moved for judgment notwithstanding the verdict, for a remittitur, and for a collateral source reduction.
The defendant has asserted numerous grounds in support of his motions, including a claim of error by the court in allotting the plaintiff eight peremptory challenges under General Statutes §§ 51-241 and 51-243 in these consolidated cases and errors by the court in evidentiary rulings and in its charge. The defendant has also argued that both the economic and noneconomic components of the verdict are excessive as a matter of law, and that he is entitled to a set-off for collateral sources.
Each side filed a memorandum and supplemental memorandum of law in support of their position, and the court heard oral argument.
For the reasons that follow, the defendant's motions are denied, except as to the collateral source reduction.
I. CLAIM CONCERNING WRONGFUL ALLOWANCE OF EIGHT PEREMPTORY CHALLENGES TO THE PLAINTIFF
The plaintiff brought this malpractice action against the defendant Howard I. Hochman, MD, by writ, summons and complaint returnable January 25, 1994. The plaintiff, after seeking an CT Page 6868 extension of the applicable statute of limitations pursuant to General Statutes § 52-190a, then brought a malpractice action against the defendant Pongsa-Pyn Muangman, MD, returnable April 26, 1994. On motion of the plaintiff, the two cases were consolidated for trial. Prior to jury selection, the parties were at issue with respect to the number of peremptory challenges to be allotted. The court allowed the plaintiff to exercise four peremptory challenges in each case, for a total of eight, and allowed the defendants Hochman and Muangman to exercise four each, for a total of eight.
After several days of trial, the plaintiff settled his claim against the defendant Muangman, and that case was withdrawn as to him. The jury returned a verdict for the plaintiff, awarding economic damages in the amount of $1,170,325.80, and noneconomic damages of $5,000,000. The jury apportioned negligence as follows: 85% to the defendant Hochman and 15% to the defendant Muangman.
Hochman now complains that the court erred because the plaintiff was only entitled to exercise four peremptory challenges under § 51-241.[1]
The court disagrees for the reasons already stated during the proceedings, which require little further discussion. Two separate actions were commenced, but were consolidated for trial. Practice Book § 9-5, 1998 Revision (formerly § 84A). However, despite consolidation, the files are required to be maintained separately, and motions and other papers must be appropriately and separately identified to each of the files.
Section 51-241 provides in relevant part: "On a trial of any
civil action to a jury, each party may challenge peremptorily three jurors." (Emphasis added.) Section 51-243 provides in pertinent part: "In any civil action to be tried to the jury in the Superior Court . . . the court may, in its discretion, direct that . . . two or more additional jurors shall be added to the jury panel, to be known as `alternate jurors'. . . . In any case when the court directs the selection of alternate jurors, eachparty may peremptorily challenge four jurors." (Emphasis added.)
The plain meaning of the statutes cannot be ignored under well settled rules of statutory construction. "[The] principal objective is to ascertain the apparent intent of the legislature. We first look for that intent in the apparent meaning of the CT Page 6869 statutory language. [W]here the wording is plain, courts will not speculate as to any supposed intention. . . . If there is no ambiguity in the language of the statute, it does not become ambiguous merely because the parties contend for different meanings." (Citations omitted; internal quotation marks omitted.)Chrysler Corporation v. Maiocco ,209 Conn. 579, 591-92,552 A.2d 1207 (1989).
In the present case, the defendant argues that "any case" in Section 51-243 means all civil cases, even two consolidated cases, and, therefore, the plaintiff was only entitled to a total of four peremptory challenges.[2] The court, however, finds this argument unpersuasive.
First, the Connecticut Supreme Court has held that "[i]f the statutory language . . . is clear and unambiguous . . . courts cannot, by construction, read into such statutes provisions which are not clearly stated." (Internal quotation marks omitted.)Iovieno v. Commissioner of Correction, 242 Conn. 689, 670,699 A.2d 1003 (1997). "In the interpretation of statutory provisions, the application of common sense to the language is not to be excluded." (Internal quotation marks omitted.) Blakeslee ArpaiaChapman, Inc. v. EI Constructors, Inc., 239 Conn. 708, 741,687 A.2d 506 (1997). The defendant's construction of § 51-243
would require the court to read into the statute provisions which simply are not there. The defendant incorrectly focuses on the single phrase "any case" to support his proposition. In Donohuev. Zoning Board of Appeals, 155 Conn. 550, 557, 235 A.2d 643
(1967), however, the court held that "[l]egislative intent is not be found in an isolated sentence. The enactment must be examined in its entirety and its parts reconciled and made operative so far as possible." Section 51-243 begins by stating that in "any civil action" the court may direct that alternate jurors be added to the panel, and it goes on to say that "in any case" in which this happens, each party may peremptorily challenge four jurors. Construing the statute as a whole, "any case" refers to any instance or circumstance in which the court selects alternate jurors, and not to "all civil actions" as argued by the defendant.
Like § 51-241, § 51-243 establishes the number of peremptory challenges a party is entitled to "in any civil action." (Emphasis added.) The word `any' has been defined as "some; one out of many; an indefinite number; One indiscriminately of whatever kind or quantity." Black's Law CT Page 6870 Dictionary (6th Ed. 1990). When used in a statute, it should be so construed as to make its meaning comport with the general scheme of the statute in which it is used. Annotation,Construction and application of provisions of Federal Reserve Actregarding continuance of bank deposit insurance after terminationof insured status of bank, 143 A.L.R. 1053, 1054 (1943). The meaning of `any' in a statute depends upon the subject matter of the statute and the context in which the word is used. Donohue v.Zoning Board of Appeals, supra, 155 Conn. 556. Although the word `any' may have a diversity of meanings, its meaning is limited by the subject matter and way in which it is used. Id. Indeed, in the context of §§ 51-241 and 51-243, its plain meaning is `one out of an indefinite number.'
In the present case, it is abundantly clear that not one, but two civil actions were being tried together. Hence, the plaintiff, having not one, but two separate and distinct civil actions, against separate defendants, was entitled to four peremptory challenges in each, for a total of eight.
This conclusion is in accord with decisions of courts in other jurisdictions. For example, in Butler v. Evening Post Pub.Co., 148 F. 821 (4th Cir. 1906), cert. denied, 204 U.S. 670,27 S.Ct. 785, 51 L.Ed. 672 (1907), the court held that when separate actions by the same plaintiff are consolidated for trial in order to avoid waste of time and unnecessary expense, the plaintiff and defendants are each entitled to the same number of challenges to jurors as they would have been entitled to had the cases been tried separately. See also Signal Mountain Portland Cement Co. v.Brown, 141 F.2d 471, 477 (6th Cir. 1944); United Verde Cooper Co.v. Jordan, 14 F.2d 299, 302 (9th Cir.), cert. denied,273 U.S. 734, 47 S.Ct. 243, 71 L.Ed. 865 (1926); Davis v. Jessup,2 F.2d 433, 434 (6th Cir. 1924); Betts v. United States, 132 F. 228, 235
(1st Cir. 1904).
It should be noted that Connecticut Mutual Life Insurance Co.v. Hillmon, 188 U.S. 208, 23 S.Ct. 294, 47 L.Ed. 446 (1903), is not to the contrary. In that case, the court, in dicta and without analysis, conceded that the great weight of authority supported the legal proposition urged by the defendant, namely that a single plaintiff in two consolidated cases was entitled to but three challenges, but the court, in concluded that the defendant could not have been prejudiced since it did not exhaust its challenges. In the earlier case of Connecticut Mutual LifeInsurance Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. CT Page 6871 706 (1892), there were several defendants in the various suits which were being tried together, and the Supreme Court held that "defendants in different actions cannot be deprived of their several challenges, by the order of the court, made for the prompt and convenient administration of justice, that the three cases shall be tried together." On remand, the trial court held that because there were two defendants, each entitled to three challenges for each separate action, the plaintiff was also entitled to three for each action, for a total of six.
On appeal, the Circuit Court of Appeals for the Eighth Circuit affirmed, and held that: "It is urged, however, by learned counsel for the defendant, that, as the two actions were consolidated for trial, the plaintiff was only entitled to three peremptory challenges. It is to be observed that when this case was before the Supreme Court, and was under consideration in the case last cited (145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706), that court held that, when actions are consolidated, such an order does not operate to deprive either defendant of the right to challenge as many jurors peremptorily as he would have been entitled to challenge if the cases had been tried separately; and the former judgment in favor of the plaintiff was reversed because each defendant to the consolidated cause was not allowed three peremptory challenges. If this rule is applied to the defendants — that is to say, if consolidated causes are treated separately, so far as the defendants are concerned, for the purpose of preserving to them their respective rights to challenge — we perceive no reason why the same rule should not be applied to the plaintiff so as to entitle her to the same number of challenges which she would have been entitled to had the cases been tried separately." Connecticut Mutual Life Ins.Co. v. Hillmon, 107 F. 834 (8th Cir. 1901).
The defendant appealed, and the Supreme Court was confronted with the converse of the proposition established in the earlier case. The Supreme Court, however, did not address the merits of the question, and reversed the decision of the Court of Appeals on other grounds. Connecticut Mutual Life Insurance Co. v.Hillmon, supra, 188 U.S. 220. See also Davis v. Jessup, supra, 2 F.2d 434; Betts v. United States, supra, 132 F. 238-39; Butler v.Evening Post Pub. Co., supra, 148 F. 824 (holding that "the decision of the Circuit Court of Appeals for the Eighth Circuit . . . is the law"). This is in accord with a court's common law discretionary power to permit a party to exercise additional peremptory challenges when to do so would be in the CT Page 6872 interests of justice.
Therefore the claim of the defendant that the plaintiff was improperly afforded eight peremptory challenges fails.
 II. CLAIMS RELATING TO PLAINTIFF'S EXPERT WITNESS, DR. SPELLMAN
The defendant claims that the court improperly 1) allowed the plaintiff's witness, Robert Spellman, M.D., a urologist, to testify as an expert on the applicable standard of care; (2) found that Spellman was a similar health care provider to the defendant, a pediatric urologist; and, (3) limited the defendant's voir dire cross-examination of Spellman.
A. QUALIFICATIONS
The defendant Dr. Howard I. Hochman holds himself out to be a pediatric urologist who is board certified in urology. There is no board certification for "pediatric" urology, a subspecialty of urology. Spellman was board certified in urology in 1961, practiced urology for about 40 years, taught urology at Tufts Medical School, was affiliated with several hospitals and was chief of urology at St. Elizabeth's Hospital and acting chief of the urological service at New England Medical Center. Although he had never performed the surgery at issue in the present case (a dismembered pyeloplasty) on a neonate, and had not performed this particular surgery for a number of years, his urological training, experience and knowledge was extensive.
He was familiar with uteropelvic junction obstructions and performed the first dismembered pyeloplasty at Cornell in 1954. He was familiar with the use and need for neophrostomy tubes for drainage. Spellman was familiar with the treatment of patients with a solitary kidney (one working kidney) and with the surgical removal of foreign bodies from the area of a kidney.
He was familiar with the standard of care for a board certified urologist in 1992 as to the surgical procedures involved in this case and the after care involved and the urologic principles including insuring adequate kidney drainage. Board certification in urology embraces the care and treatment of children, including neonates and adults.
The general principles related to this surgery and after care CT Page 6873 are the same for adults and children, including neonates; and the surgical techniques were substantially the same and had not changed.
General Statutes § 52-184c controls the qualifications of an expert witness and admission of his testimony in medical malpractice actions, and provides as follows in relevant part:
 (c) If the defendant health care provider is certified by the appropriate American Board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a "similar health care provider" is one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty . . .;
 d) Any health care provider may testify as an expert in any action if he: (1) Is a "similar health care provider" pursuant to subsection (b) or (c) of this section; or (2) is not a similar health care provider pursuant to subsection (b) or (c) of this section but, to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience or knowledge shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim
The defendant essentially argues that the court qualified Spellman simply on the basis of board certification, that in any event as the defendant was a specialist in pediatric urology, Spellman was not a similar health care provider, and that the court improperly limited the defendant's voir dire cross-examination of Spellman on his qualifications.
None of these claims are persuasive.
The court exercised its discretion based on the evidence, as it is bound to do, when it determined that Spellman was qualified to testify as an expert under § 52-184c. Spellman's education, knowledge, training, experience and board certification clearly established that he is a "similar health CT Page 6874 care provider" within the meaning of § 52-184c(c).
Even if the defendant is correct in his assertion that Spellman, a board certified urologist, is not a `similar health care provider' to the defendant, a board certified urologist who holds himself out as a `pediatric urologist' specializing in the treatment of children, this is equally unavailing. Spellman clearly possessed "sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine" to testify as an expert under § 52-184c(d), as it cannot be seriously disputed that urology is a related field of medicine to `pediatric urology.'
"The determination of the qualification of an expert is largely a matter for the discretion of the trial court . . . Furthermore, the question of a witness' competency to testify on technical matters is an issue to be determined by the trier by assessing the nature of the technicality involved and the proposed witness' level of expertise concerning these matters." (Citations omitted; internal quotation marks omitted.) Wallace v.St. Francis Hospital Medical Center, 44 Conn. App. 257,260-261, 688 A.2d 352 (1997).
 B. LIMITATION OF DEFENDANT'S CROSS-EXAMINATION ON SPELLMAN'S QUALIFICATIONS
The court permitted the defendant to cross-examine Spellman in the absence of the jury as to his qualifications. This cross-examination was extensive and far and wide ranging over Spellman's specific training and experience with the surgical procedure involved, the ages of his patients, his level of involvement with neonatal surgery, the last time he performed such surgery, the type of surgery he regularly performed prior to his retirement, and the like. When the defendant began to cross-examine Spellman on credibility issues, which included inconsistencies in prior testimony he had given in the state of Georgia, and attacks on the weight of Spellman's qualifications, the court ruled that Spellman was qualified to opine on the standard of care in this case, and that the defendant's cross-examination was no longer focused on a voir dire of Spellman's qualifications, but went to weight and credibility. The defendant, in the presence of the jury, was permitted wide latitude in his cross-examination of Spellman, with respect to the issues in the case his qualifications and his credibility. "Once the threshold question of usefulness to the jury has been CT Page 6875 satisfied, any other questions regarding the expert's qualifications properly go to the weight, and not to the admissibility, of his testimony." Davis v. Margolis,215 Conn. 408, 417, 576 A.2d 489 (1990). The defendant does not and cannot claim that his right of cross-examination was unduly limited or abridged with respect to Spellman before the jury.
Hence, the defendant cannot show that he was prejudiced or harmed in any way, and the defendant's claims relating to Spellman fail.
III. CLAIMS WITH RESPECT TO THE CHARGE
The defendant claims that the court improperly (1) failed to charge on the maxim of falsus in uno, falsus in omnibus, and (2) charged on liability, apportionment, intervening cause, and the standard of care.
 A.
It is true, that despite the defendant's written request to charge on the maxim falsus in uno, falsus in omnibus, the court refused to so charge. Instead, the court gave an extensive charge on the credibility of lay and expert witnesses, and instructed the jury that they could accept some, all or none of a witness' testimony. The court also charged the jury that if "a witness has testified inaccurately on any material point, you may take that into consideration in determining whether he has testified inaccurately on other points."
The charge on credibility determination gave sufficient guidance to the jury on the issue. Connecticut Appellate precedent does not require the giving of a charge on the maxim, even if a witness intentionally testified falsely, which this court did not find. Even if it was a matter for the jury to make such a finding, whether to give such a charge on the maxim is entirely discretionary. See Young v. Falk, 34 Conn. App. 852,855-56, 643 A.2d 1314 (1994). (Holding that "[i]nstruction on the maxim is a matter vesting in the sound discretion of the trial judge").
 B.
The court disagrees with the defendant's other claims of error in the charge. It would serve no useful purpose to discuss CT Page 6876 each of the defendant's claims in detail. Suffice it to say, the court did instruct the jury on the applicable standard of care and with respect to the doctrines of intervening cause, liability and apportionment.
 [A] jury charge is to be considered from the standpoint of its effect on the jury in guiding them to a correct verdict. . . . A jury charge must be correct in law, adapted to the issues and sufficient for the guidance of the jury. . . . A charge is not to be critically dissected for purposes of discovering possible inaccuracies . . . but rather, the initial charge and any supplemental charge are to be read as a whole. . . . The ultimate test of a court's instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law.
(Citations omitted; internal quotation marks omitted.) Remingtonv. Aetna Casualty Surety Co., 240 Conn. 309, 316, 692 A.2d 399
(1997).
The defendant also asserts that the court improperly placed the burden of proof upon him to show that the apportionment defendant, Muangman, was negligent in ways other than were admitted and that such negligence was a proximate cause of the plaintiff's injuries. He provides no authority for that proposition, and the court could find none. Contrary to the defendant's position, Baxter v. Cardiology Associates of NewHaven, P.C., 46 Conn. App. 377, 699 A.2d 271, cert. denied,243 Conn. 933, 702 A.2d 640 (1997), approved the trial court's allocation of the burden of proof to the party claiming the benefit of apportionment.
The defendant finally argues that the court should have instructed the jury that the percentage of negligence apportioned to Dr. Muangman could not be less than 50%. The defendant again cites no authority for this proposition, aside from claiming that Dr. Muangman's admitted negligence in breaking off a piece of guide wire in the plaintiff during the insertion of the nephrostomy tube was the precipitating cause of the defendant's operation. Therefore, the defendant appears to argue, that Dr. Muangman's negligence, as a matter of law, had to be no less than 50% of the total negligence involved. This ignores the well settled rule that proximate cause is ordinarily a question of CT Page 6877 fact; Tetro v. Stratford, 189 Conn. 601, 605, 458 A.2d 5 (1982); and as such, is a question for the jury. Brown v. Board ofEducation, 42 Conn. App. 824, 826, 681 A.2d 996, cert. denied,239 Conn. 933, 683 A.2d 400 (1996).
Just as proximate cause is a question for the jury, the apportionment of negligence resulting in a plaintiff's injuries must also be a question for the jury. See General Statutes §52-572h. This claim also fails.
IV. CLAIM OF INSUFFICIENT FACTUAL FOUNDATION TO ADMIT ECONOMIST'S TESTIMONY
The plaintiff called Gary Crakes, a professor of economics at Southern Connecticut State University, with a Ph.D. in economics to testify as an expert witness. Professor Crakes also operates a private business providing economic analyses for attorneys in civil actions, and for others.
The plaintiff was six years old at the time of trial and was attending school as a special education student. For the purpose of calculating the present value of the loss of earning capacity, Professor Crakes projected a median earning capacity based on a child's date of birth, sex and work life expectancy. He assumed that the plaintiff would have graduated high school, if not injured, and estimated deductions such as income taxes and personal living expenses. He also assumed that the plaintiff would have married, if not injured, and took into account the plaintiff's shortened life expectancy. Professor Crakes opined that the net loss of earning capacity for a person in the position of the plaintiff, after deductions for income taxes and personal living expenses, reduced to present value, was the sum of $910,925. The calculation was based on statistical information available from government agencies such as the U.S. Departments of Labor and Commerce, which are generally relied upon by economists in the field. The defendant moved to strike Dr. Crake's opinion and testimony, claiming that there was an insufficient factual basis for it. I find that there was sufficient information about the plaintiff's family to conclude that the assumption that the child would graduate high school was appropriate. The marriage assumption actually worked to the benefit of the defendant, reducing the claimed net loss of earning capacity. "Some facts must be shown as the foundation for such an opinion, but there is no rule of law declaring the precise facts which must be proved before such an opinion may be CT Page 6878 received in evidence." Oborski v. New Haven Gas. Co.,151 Conn. 274, 280, 197 A.2d 73 (1964). The remainder of the defendant's objections go to the weight to be given to Crake's testimony.
Economics is not an exact science. The defendant did not object to Crake's qualifications and cross-examined him thoroughly and extensively. Also, the defendant did not present an economics expert to challenge Crake's evidence, despite having had opportunity to do so.
Therefore the credibility of Crake's testimony and opinion was thoroughly placed before the jury. "Economic evidence and the testimony of economic experts are appropriately weighed by the jury." Mather v. Griffin Hospital, 207 Conn. 125, 145,540 A.2d 666 (1988). The defendant's claim is not persuasive.
V. CLAIMS OF IMPROPER ADMISSION OF EVIDENCE A. TESTIMONY OF DR. PONGSA-PYN MUANGMAN
The plaintiff called Dr. Muangman, the defendant in the consolidated case, to testify. The plaintiff elicited testimony that nephrostomy tubes were used to relieve pressure in the kidney and minimize infection and that certain diagnostic tests, such as CAT scans, were available in 1992 at St. Francis Hospital. The sole objection made by the defendant was that the plaintiff failed to disclose Muangman as an expert witness under Practice Book § 220(D), (now § 13-4 (4)).
The court ruled that the testimony was basically factual in nature and was not opinion relating to either causation or the standard of care. Moreover, the court agrees with the plaintiff that even if the testimony could be considered expert opinion, the defendant did not argue or show that such testimony would cause undue prejudice to the defendant, of cause undue interference with the orderly progress of the trial or involved bad faith delay or disclosure by the plaintiff.
The court finds none of these situations existed, and, thus was acting within its discretion under Practice Book § 13(4) to allow Muangman's testimony. Finally, the testimony allowed was merely cumulative to other evidence in the case and the defendant cannot show that he was harmed by it.
 B. USE OF JOURNAL OF UROLOGY ARTICLE
CT Page 6879
The plaintiff cross-examined the defendant's expert witness Dr. Anthony A. Caldamone on an article published in the Journal of Urology. The defendant objected on the basis of hearsay. The court admitted the article into evidence for credibility purposes, finding the Journal of Urology and the article itself authoritative. Caldamone stated that the article's authors were "top notch" and well respected urologists and radiologists. He also stated that the journal is a publication that other urologists would look to get expert information on a particular topic, and that any papers presented for publication require rigorous scrutiny by other knowledgeable urologists, which is more rigorous than that applied to text books. He further stated that papers submitted on issues relating to children are generally scrutinized by experts in the field of pediatric urology. Caldamone himself is on the editorial board of the Journal of Urology. The article published a study involving the management of 89 neonates with obstruction of the uretopelvic junction, a condition the same as the plaintiff's, and was clearly admissible for impeachment of the defendant's expert witness. See C. Tait J. Plante, Connecticut Evidence, 2d Ed. (1988), § 11.19.1.
VI. COLLATERAL SOURCE REDUCTION
The parties have agreed that the net collateral source reduction is $138,908.66. They dispute however, the method of its application. The defendant asserts that the reduction should be made from the portion of the award attributable to him, otherwise the plaintiff would be the recipient of a windfall. The plaintiff asserts that the reduction should be made from the total damage award and then the net amount should be reduced by the percentage of negligence attributable to the defendant. The plaintiff relies on Fleming v. Garnett, 231 Conn. 77, 92, 646 A.2d 1308 (1994) andBower v. D'Onfro, 38 Conn. App. 685, 698, 663 A.2d 1061, cert. denied 235 Conn. 911, 665 A.2d 606, cert. denied, 235 Conn. 912,665 A.2d 606 (1995) in support of his position. The defendant relies on his construction of General Statutes § 52-225a for his position, and claims that Fleming and Bower dealt with Tort Reform I claims, rather than a Tort Reform II claim, as in the present case.
In Bower, a strikingly similar fact pattern to this case, the trial court's retroactive application of Tort Reform II excluding a settlement amount from the definition of "collateral source" CT Page 6880 was approved by the Appellate Court. Both Bower and Fleming also approved the method used by the trial court in deducting the net collateral source payment from the whole award, before apportionment.
In Bower, the Appellate Court discusses our Supreme Court's analysis of the defendant's claim in Fleming, which was the same claim the defendant raises here. "Section 52-225a provides that the net collateral source reduction must be applied to the damages . . . awarded to compensate the claimant. The defendant asserted that the term `award' as used in this context, means the defendant's proportionate share of the recoverable damages. The court found no support for this reading of the statute and found that the challenged language, which contains no express qualification of the amount of the award, supported the trial court's application of the collateral source reduction to thetotal damages found by the jury." (Emphasis added; internal quotation marks omitted.) Bower v. D'Onfro, supra,38 Conn. App. 699. The Appellate Court went on to say: "According to our Supreme Court, the current statute defines `award' in terms of a claimant's total loss, as opposed to the liability assessed against any particular defendant." (Internal quotation marks omitted.) Id., 699-700.
Section 52-225a (a) now states in relevant part, "In any civil action, whether in tort or contract, wherein the claimant seeks to recover damages resulting from (1) personal injury or wrongful death occurring on or after October 1, 1987 . . ., and wherein liability is admitted or is determined by the trier of fact and damages are awarded to compensate the claimant, the court shall reduce the amount of such award which represents economic damages . . ., by an amount equal to [the collateral source payments]." (emphasis added)
The only relevant significant change in the statute is that the collateral source reduction is applied only to the award for economic damages, rather than the total award. The result, in this case, however, remains the same as the statute still defines `award' in terms of the claimant's loss, rather than the apportionment of liability against any particular defendant.
Accordingly, the collateral source reduction calculation is as follows:
Award for Economic Damages: $ 1,170,325.80 CT Page 6881
 Less Net Collateral Source Reduction $ (138,908.66)
 Plus Award for Noneconomic Damages $ 5,000,000.00
 Total Damage Award after Collateral Source Adjustments $ 6,031,417.14
Therefore, the adjusted award of $6,031,417.14 when multiplied by 85% negligence attributed to defendant Hochman yields $5,126,704.53, the net award as to the defendant Hochman.
VII. CLAIM THAT VERDICT WAS EXCESSIVE AS A MATTER OF LAW
Finally, the defendant claims that the verdict is excessive as a matter of law. The jury awarded $1,170,325.80 in economic damages and $5,000,000 in noneconomic damages, and apportioned 85% of the responsibility to the defendant, and 15% to the settlings defendant in the companion case.
The parties have agreed that the methodology used in Peck v.Jacquemin, 196 Conn. 53, 491 A.2d 1043 (1985) and Mauro v.Yale-New Haven Hospital, 31 Conn. App. 584, 627 A.2d 443 (1993) should be adopted in the determination of whether a verdict is excessive. In each of those cases a settlement was followed by a verdict, and the settlement amount was added to the verdict. The total was then used as the lodestar to determine whether the combined amount of the settlement and verdict was excessive. The portion of the total verdict attributed to Hochman was $6,170,325.80 x 85% = $5,244,776.88. When the Muangman settlement is added, the total recovery is several hundred thousand dollars higher than the verdict.[3]
"In determining whether the combined recovery is excessive, the basic question is whether it falls somewhere within the necessarily uncertain limits of just damages or whether the size [of the combined recovery] so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption." Apuzzo v. Seneco,178 Conn. 230, 234, 423 A.2d 866 (1979).
At the trial, evidence was admitted that the plaintiff incurred $259,400.80 in medical, hospital and surgical expenses. CT Page 6882 Professor Crake's opinion as to the net loss of earning capacity was also admitted. The amount awarded for economic damages appears clearly in line with that evidence, and appears to have been founded upon that evidence.
As stated previously, Crakes was extensively and thoroughly cross-examined. The jury was instructed that they could accept or reject all or part of any expert's opinion, and that the value of an expert's opinion was based on the proven facts relied upon and whether they were material to his opinion. It was the province of the jury, acting reasonably to accept or reject any or all of Crakes' testimony. I cannot find that it was unreasonable for the jury to accept his opinion in total, under all of the circumstances of this case. Thus, the jury, as to the economic damages, was obviously not influenced by partiality, prejudice, mistake or corruption.
The defendant finally claims that the amount of the combined recovery relating to noneconomic damages is excessive. The plaintiff child in this case suffered a severe and catastrophic, permanently disabling brain injury. He was hospitalized for a substantial period of time. He underwent several operative procedures. Although there was no estimate of the cost of his future medical care, there was evidence he would require it. The plaintiff cannot sit, walk or stand without assistance. He cannot feed or bathe himself or attend to any of his physical needs. He will never be able to care for himself. He is visually impaired and cannot speak, and is and will be permanently disabled and unable to participate in any of the usual and normal pleasures of every day human life. Indeed, the child has in this court's view, suffered an almost total loss of all meaningful life's activities and life's enjoyments.
A videotape of the child and his physical therapy and other activities, was admitted into evidence. The child himself was briefly present before the jury. Therefore, the jury had an opportunity to observe the child's condition, see his actions, hear his cries and sounds, and graphically perceive the profoundly devastating effects of his injuries.
A jury can properly award damages for the loss of enjoyment of life's activities. Life's enjoyment may not be the subject of mathematical precision or calculation. It is not bought or sold and is truly incapable of monetary valuation. The plaintiff child has suffered a devastating and crippling injury which has had a CT Page 6883 horrific effect upon him. The amount of damages awarded is a matter peculiarly within the province of the jury, as is the credibility of witnesses and the weight to be accorded their testimony. Childs v. Bainer, 235 Conn. 107, 112, 663 A.2d 398
(1995).
"The only practical test to apply to a verdict is whether the award of damages falls somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case, or whether the verdict is so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, mistake or corruption." (Internal quotation marks omitted.) Parasco v. Aetna Casualty Surety Co.,48 Conn. App. 671, 676, ___A.2d ___ (1998).
On issues where the evidence allows room for reasonable differences of opinion among fair-minded people, if the conclusion of the jury is one that reasonably could have been reached, it must stand even though the opinion of the trial court might be that a different result should have been reached. SeeJacobs v. Goodspeed, 180 Conn. 415, 429 A.2d 915 (1980).
A verdict should not be set aside "where it is apparent that there was some evidence upon which the jury might reasonably [have reached its] conclusion." Champagne v. Raybestos-Manhattan,Inc., 213 Conn. 509, 555, 562 A.2d 1100 (1989). I cannot conclude from the evidence that the combined recovery,[4] which is several hundred thousand dollars in excess of $5,000,000 for the noneconomic damages sustained by the plaintiff, which damages are tantamount to a virtual loss of the quality of his life, is excessive or exorbitant. Accordingly, the defendant's motions are denied except as to the collateral source reduction claim and judgment may enter for the plaintiff to recover from the defendant Hochman, the sum of $5,126,704.53.
Teller, J.