# ALISSA NASH ET AL. *v.* JESUS F. YAP, JR., ET AL.
## (SC 15742)

Borden, Berdon, Norcott, McDonald and Peters, Js.

Argued September 25, 1998—officially released February 16, 1999

*Ernest F. Teitell*, with whom, on the brief, were *Mario DiNatale* and *Jonathan M. Levine*, for the appellants-appellees (plaintiffs).

*John R. Downey*, for the appellee-appellant (named defendant).

*Donna R. Zito*, for the appellee-appellant (defendant Karl E. Alcan).

*Opinion*

PETERS, J. In the late 1980s, the General Assembly enacted two tort reform statutes. Public Acts 1986, No. 86-338 (P.A. 86-338), known as Tort Reform I,[1] effective October 1, 1986, made fundamental changes in the extent of damages that a tortfeasor must pay. Public Acts 1987, No. 87-227 (P.A. 87-227), known as Tort

---

[1] Public Act 86-338 was codified as General Statutes §§ 13a-149, 30-102, 52-102, 52-184c, 52-190a, 52-225a, 52-225b, 52-225c, 52-225d, 52-226a, 52-251c, 52-557m, 52-557n, 52-568, 52-572h.

Reform II,[2] effective October 1, 1987, amended Tort Reform I to respond to criticisms about some provisions of the earlier legislation. The principal issue in this case is whether the liability apportionment provisions of either of those acts applies to tortious conduct that occurred between October 1, 1986, and October 1, 1987, but was not discovered until after October 1, 1987. Identification of the applicable statutory or common-law principles is crucial to a determination of the parties' arguments about the apportionment of tort liability and about the reduction of liability because of a third party settlement.

The plaintiff Steven A. Ayres, as guardian of the named plaintiff, Alissa Nash (child),[3] initiated this medical malpractice action against two cardiologists, the defendants, Jesus Yap, Jr., M.D., and Karl Alcan, M.D., alleging that each of them negligently had caused the child to suffer irreversible pulmonary disease. St. Joseph's Medical Center (hospital), also named as a defendant initially, settled with the plaintiff prior to the trial.

A jury returned a verdict in favor of the plaintiff, including an award of $2,315,000 in damages, and allocated responsibility among Yap, Alcan and the hospital. After accepting the jury's verdict, the trial court apportioned liability for the plaintiff's damages in accordance with Tort Reform II. The trial court denied the defendants' separate motions to set aside the verdict and the defendant Yap's motion for remittitur.

[2] Public Act 87-227 was codified as General Statutes §§ 30-102, 52-102, 52-184c, 52-190a, 52-251c, 52-225a, 52-225b, 52-225c, 52-225d, 52-557m, and 52-572h.

[3] The original complaint was brought on the child's behalf by her grandmother, Beverly A. Z. Nash. In October, 1992, the Probate Court named Ayres as guardian of the child's estate. The trial court then substituted Ayres as the party plaintiff in lieu of Beverly A. Z. Nash. In March, 1996, the trial court granted Ayres' motion to dismiss the claims of Beverly A. Z. Nash to recover medical costs for the child's care. The only remaining plaintiff is,

The parties appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeals to this court pursuant to Practice Book § 65-1, formerly § 4023, and General Statutes § 51-199 (c).[4] We affirm the judgment of the trial court in part and reverse in part.

I

The jury reasonably could have found the following facts. The child, who has Down's syndrome, was born with an atrioventricular septal defect, which is a large hole between the ventricle and the atrium of the heart. With proper diagnosis in the first few years of life, that defect usually can be corrected surgically. Uncorrected, the condition leads to pulmonary vascular disease, which becomes progressively more severe and causes a painful death at an early age. Because the child's heart defect was allowed to go untreated for three years, she now suffers from pulmonary vascular disease. The child's lungs will continue to degenerate, and she will be particularly vulnerable to other health disorders, including pneumonia, stroke and skin ulcers. Needing continuing assistance with basic functions, the child eventually will be confined to her bed.

The child's primary care physicians at the hospital arranged, on two occasions, for an echocardiogram, a diagnostic test for heart disease, to assess her heart condition. In March, 1986, and April, 1987, they arranged for Yap to perform an echocardiogram, and for Alcan to review and interpret the echocardiogram record. Yap, who was head of the cardiology unit and performed the echocardiograms, did not ensure that the abnormalities that he had observed were fully communicated in the

therefore, Ayres as guardian for the child. References to the plaintiff are to Ayres.

[4] General Statutes § 51-199 (c) provides in relevant part: "The Supreme Court may transfer to itself a cause in the Appellate Court. . . ."

1986 and 1987 test reports. He failed to communicate his findings orally either to his fellow cardiologist, Alcan, or, in 1987, to the primary care physicians. Alcan's reports, in March, 1986, and in April, 1987, did not state all the anatomical abnormalities of the child's heart, and did not fully reflect the seriousness of her condition. Alcan did not communicate orally with the child's primary care physicians in either 1986 or 1987 to alert them to her heart condition.

The child's primary care physician relied on Alcan's written reports in concluding that the child did not require immediate surgery either in 1986 or in 1987. He relied on the absence of a critical warning in Alcan's initial written report in 1986, and concluded that Alcan's 1987 report indicated no significant change.

The child's condition was not diagnosed properly until June, 1988, when she was examined by a pediatric cardiologist at Yale-New Haven Hospital. He determined that the child had a complete atrioventricular septal defect. Because she was then almost three years old, her heart defect had become inoperable and her pulmonary vascular disease had become irreversible.

As part of its verdict in favor of the plaintiff, the jury, in response to written interrogatories, determined that neither defendant had exercised the degree of care, skill and diligence toward the child that the standard of care required, and that their malpractice proximately had caused harm to her. The jury allocated 17.5 percent of the responsibility for the child's injury to Yap, 17.5 percent to Alcan, and 65 percent to the hospital, which was not a defendant because of its earlier settlement.

In response to additional interrogatories, the jury found that the child's injury had occurred between October 1, 1986, and October 1, 1987, but that her care-takers did not discover and reasonably were not required to have discovered the connection between

her injuries and the defendants' malpractice until after October 1, 1987. The jury also found that the defendants did not violate the standard of care before October 1, 1986.

## II

On appeal, the plaintiff maintains that, in apportioning liability for damages among the two defendant physicians and the nondefendant hospital, the trial court improperly applied the provision of Tort Reform II codified in General Statutes § 52-572h (c).[5] The plaintiff claims that, under the circumstances of this case, the trial court should have followed the common-law principle of joint and several liability.In their cross appeals, both defendants claim that the trial court should have followed the provisions of Tort Reform I[6] rather than those of Tort Reform II.[7] Although both tort reform statutes provide for apportionment of tort damages, Tort Reform I, if applicable, would require the damages award to be reduced by the amount that the plaintiff received in settlement from the hospital.

In his cross appeal, the defendant Alcan further challenges the propriety of the trial court's: (1) jury charge with respect to the caretaker standard; (2) failure to charge the jury to consider the liability of nonparties who provided medical care to the child; and (3) denial of his motion to set aside the verdict on the ground of insufficient evidence of proximate cause.

---

[5] General Statutes § 52-572h (c) provides: "In a negligence action to recover damages resulting from personal injury, wrongful death or damage to property occurring on or after October 1, 1987, if the damages are determined to be proximately caused by the negligence of more than one party, each party against whom recovery is allowed shall be liable to the claimant only for his proportionate share of the recoverable economic damages and the recoverable noneconomic damages except as provided in subsection (g) of this section."

[6] See footnote 15 of this opinion.

[7] See footnote 15 of this opinion.

We are unpersuaded by the plaintiff's appeal. We agree with the defendants about the applicability of Tort Reform I. We disagree with Alcan's claims on his separate cross appeal. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

### III

We turn first to the plaintiff's claim that each defendant is fully liable to pay the entire damages award because the common-law rule of joint and several liability applies in this case. Both Tort Reform I and Tort Reform II replaced joint and several liability with apportionment of liability among tortfeasors.[8] The plaintiff argues, however, that each of the defendants continues to be liable for $2,315,000 in damages. According to the plaintiff, Tort Reform I does not govern this case because it was repealed by Tort Reform II, and the apportionment provision of Tort Reform II does not apply to this case because the defendants' malpractice occurred before its effective date. We agree, however, with the contrary position of the defendants, who argue persuasively that Tort Reform I is the governing law and that its provisions supersede common-law rules of joint and several liability.

### A

Prior to 1986, Connecticut tort law adhered to the common-law rule of joint and several liability for the allocation of responsibility for damages resulting from an injury caused by more than one person. See *Donner* v. *Kearse*, 234 Conn. 660, 666, 662 A.2d 1269 (1995). Under this doctrine, an injured person was entitled to recover the entire amount of a damages award from any defendant whose conduct proximately caused the

---

[8] Both tort reform acts modified § 52-572h (c) and require that negligent parties be held liable only for their proportionate shares of damages. See footnotes 5 and 9 of this opinion.

injury. Id., citing *Rose* v. *Heisler*, 118 Conn. 632, 633, 174 A. 66 (1934).

In 1986, by enacting Tort Reform I, P. A. 86-338, the General Assembly replaced the common-law rule of joint and several liability with a system of apportioned liability that holds each defendant liable for only his or her proportionate share of damages.[9] The new statute applied to injuries *"accruing* on or after" the act's effective date, October 1, 1986.[10] (Emphasis added.)

One year later, in P.A. 87-227, Tort Reform II, the legislature amended Tort Reform I. The legislature made that revision applicable to injuries *"occurring* on or after October 1, 1987."[11] (Emphasis added.)

The plaintiff argues that the trial court should have applied the common-law rule because neither version of the tort reform statutes applies in the present case. He focuses on the jury's findings that the child's injury *occurred* before October 1, 1987, but reasonably was

---

[9] Public Act 86-338, § 3 (c), amended General Statutes § 52-572h (c) and provided: "Unless otherwise provided by law, in a negligence action to recover damages for personal injury or wrongful death, accruing on or after the effective date of this act, if the damages are determined to be proximately caused by the negligence of more than one person, each person against whom recovery is allowed shall be liable to the claimant only for his proportionate share of the recoverable economic damages and the recoverable noneconomic damages except as provided in subsection (g) of this section." The effective date of the act was October 1, 1986. Public Act 86-338, § 17.

An exception in subsection (g) of P.A. 86-338, § 3, directs the court to reallocate the amount of certain awarded damages that a claimant is unable to collect among the other parties according to their respective percentages of negligence.

[10] See footnote 9 of this opinion.

[11] As amended by Tort Reform II, General Statutes § 52-572h (c) now provides: "In a negligence action to recover damages resulting from personal injury, wrongful death or damage to property occurring on or after October 1, 1987, if the damages are determined to be proximately caused by the negligence of more than one party, each party against whom recovery is allowed shall be liable to the claimant only for his proportionate share of the recoverable economic damages and the recoverable noneconomic damages except as provided in subsection (g) of this section."

not *discovered* to have been caused by the defendants' malpractice until after October 1, 1987. Relying on the proposition that substantive rights are determined by the law effective at the time a cause of action accrues; *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 520–21, 562 A.2d 1100 (1989);[12] the plaintiff maintains that the cause of action did not accrue until discovery of the defendants' malpractice after October 1, 1987. For this reason, he maintains that Tort Reform I does not govern.

Although the logic of the plaintiff's position would seem to point to the applicability of the apportionment rules contained in Tort Reform II, which became effective on October 1, 1987, the plaintiff maintains that the apportionment rules of Tort Reform II cannot apply to damages arising from malpractice that occurred before its effective date. In response to interrogatories, the jury found that the child's injury had "occurred" before October 1, 1987. The plaintiff concludes that, in the catch-22 situation that he envisions, the law reverted to the common-law doctrine of joint and several liability.

Because of the statutory presumption that legislation affecting substantive rights is intended to operate prospectively; see General Statutes §§ 1-1 (u) and 55-3;[13]

---

[12] This court stated in *Champagne* v. *Raybestos-Manhattan, Inc.*, supra, 212 Conn. 520–21: "Substantive rights of the parties are fixed at the date upon which the cause of action accrued. . . . In Connecticut, a cause of action accrues when a plaintiff suffers actionable harm. . . . Actionable harm occurs when the plaintiff discovers or should discover, through the exercise of reasonable care, that he or she has been injured and that the defendant's conduct caused such injury." (Citations omitted; internal quotation marks omitted.)

[13] General Statutes § 1-1 (u) provides: "The passage or repeal of an act shall not affect any action then pending."

General Statutes § 55-3 provides: "Limitation of effect of certain acts. No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect."

we agree with the plaintiff that the apportionment provision of Tort Reform II cannot apply to malpractice that occurred before its effective date. That conclusion, however, does not end the analysis. Unless Tort Reform II was intended to repeal rather than to amend Tort Reform I, the plaintiff is bound by the provisions of Tort Reform I.

Although the plaintiff argues for repealer, we already have decided that our legislative practices usually indicate that the legislature's nomenclature of "repeal" manifests the legislature's intent to modify and to amend prior legislation, and not to extinguish it ab initio. *LeConche* v. *Elligers*, 215 Conn. 701, 707, 579 A.2d 1 (1990); *State* v. *Kozlowski*, 199 Conn. 667, 675–76, 509 A.2d 20 (1986). As we observed in *LeConche*, legislative history shows that the General Assembly, in changing the provisions of Tort Reform I, can be presumed to have intended to correct newly discovered flaws without having intended thereby to repeal the earlier enactment. *LeConche* v. *Elligers*, supra, 707. Following *LeConche*, we conclude that the General Assembly, in enacting the apportionment provisions of Tort Reform II, intended to amend and not to repeal Tort Reform I in its entirety. The provisions in Tort Reform I that deal with the apportionment of liability, which were not amended by Tort Reform II, continue, therefore, to have operative force.

As a result, despite the reasonable delay in discovering the child's injury, a delay that arguably meant that no action on her behalf accrued until after October 1, 1987, the dispositive fact is that the present action accrued after the effective date of Tort Reform I. Whether the action accrued before or after the statute's amendment by Tort Reform II is irrelevant. Tort responsibility must now be apportioned.

Additional principles of statutory construction support the conclusion that, despite the enactment of Tort

Reform II, this case is governed by the rule of apportioned liability contained in Tort Reform I. The legislature is presumed to have acted in light of existing relevant statutes and with the intent of creating a consistent body of law. *McKinley* v. *Musshorn*, 185 Conn. 616, 623, 441 A.2d 600 (1981). The plaintiff's proposed construction would be inconsistent with the legislature's purpose in enacting tort reform to apply to all injuries "accruing" after October 1, 1986 to the present. See *LeConche* v. *Elligers*, supra, 215 Conn. 707. Moreover, implied repeal of a statute is not favored and will not be presumed where, as here, the old and new statutes can coexist peaceably. *Putala* v. *DePaolo*, 225 Conn. 378, 388, 623 A.2d 989 (1993); see also *Jones* v. *Mansfield Training School*, 220 Conn. 721, 726, 601 A.2d 507 (1992) (if two constructions of statute are possible, courts will use reasonable construction over unreasonable one).

We conclude, therefore, that Tort Reform I replaced the common-law rule of joint and several liability with a statutory rule of apportioned liability that governs this case. Accordingly, with respect to the plaintiff's appeal, the judgment of the trial court is affirmed.

## IV

We next consider the defendants' cross appeal, in which they argue that the trial court, in calculating each defendant's share of the damages, improperly applied Tort Reform II, instead of Tort Reform I. We agree with the defendants that Tort Reform I applies to this case.

Both Tort Reform I and Tort Reform II direct a trial court to reduce an injured party's award for damages by the payments received from "collateral sources."[14]

---

[14] Tort Reform I provides in pertinent part: "In any civil action, accruing on or after the effective date of this act, whether in tort or in contract, wherein the claimant seeks compensation for personal injury or wrongful death and wherein liability is admitted or is determined by the trier of fact

See *Fleming* v. *Garnett*, 231 Conn. 77, 82, 92–93, 646 A.2d 1308 (1994). In principle, such reductions reflect the understanding that the entitlement of an injured party to be made whole does not include an entitlement to a double recovery for the same loss. Representing differing points of view about what makes an injured party whole, the two acts contain different definitions of "collateral sources." Under Tort Reform I, but not under Tort Reform II, settlements are treated as deductible collateral sources.[15]

Applying Tort Reform II, the trial court held each defendant responsible for 17.5 percent of the full damages award. Thus, the court reduced the plaintiff's damages award of $2,315,000 to reflect the amount that the

and damages are awarded to compensate the claimant, the court shall reduce the amount of such award by the total of all amounts paid to the claimant from all collateral sources which are available . . . ." Public Act 86-338, § 4.

Tort Reform II provides in pertinent part: "(a) In any civil action, whether in tort or in contract, wherein the claimant seeks to recover damages resulting from (1) personal injury or wrongful death occurring on or after October 1, 1987 . . . and wherein liability is admitted or is determined by the trier of fact and damages are awarded to compensate the claimant, the court shall reduce the amount of such award which represents economic damages . . . by an amount equal to the total of amounts determined to have been paid under subsection (b) of this section less the total of amounts determined to have been paid under subsection (c) of this section . . . .

"(b) . . . the total amount of collateral sources which have been paid for the benefit of the claimant as of the date the court enters judgment.

"(c) . . . any amount which has been paid, contributed, or forfeited, as of the date the court enters judgment, by, or on behalf of, the claimant or members of his immediate family to secure his right to any collateral source benefit which he has received as a result of such injury or death." General Statutes 52-225a.

[15] Tort Reform I includes as collateral sources "any payments made to the claimant, or on his behalf . . . by any person as compensation for personal injury or wrongful death attributable to the incident giving rise to the cause of action. . . ." Public Act 86-338, § 5. Tort Reform II redefined collateral sources by deleting the section quoted above and explicitly excluding settlement amounts as allowable deductions from damages awards. General Statutes § 52-225b provides: " 'Collateral sources' defined. For purposes of sections 52-225a to 52-225c, inclusive: 'Collateral sources' means any payments made to the claimant, or on his behalf, by or pursuant to:

plaintiff received in settlement from the hospital. The court required the defendants, with 17.5 percent each of the liability, to pay damages of $810,250, a percentage of the face amount of the total damages award *without* a deduction for the settlement. If, as the defendants argue, Tort Reform I applies in this case, then the trial court, before calculating the dollar amount of each defendant's 17.5 percent share, should have *reduced* the total damages award by the amount of the hospital settlement. See *Fleming* v. *Garnett*, supra, 231 Conn. 82, 92 (determining that Tort Reform I requires trial court to deduct amount of collateral sources from damages award before calculating each defendant's proportionate share).

The defendants' argument turns on use of the term "accrue" in Tort Reform I. In their view, the provision of Tort Reform I making it applicable to tort actions "accruing on or after" October 1, 1986,[16] refers to the date on which an injury occurs. Because the child's injury occurred after the effective date of Tort Reform I, but before that of Tort Reform II, Tort Reform I is the governing law. The defendants assert that the plaintiff incorrectly relies on *Champagne* v. *Raybestos-Manhattan, Inc.*, supra, 212 Conn. 509, for the argument that a cause of action accrues when an injury is discovered, because *Champagne*'s holding to that effect arose in the construction of a different statute. The defendants cite earlier case law and the legislative history of tort reform as indicative of a legislative intent, under Tort

(1) Any health or sickness insurance, automobile accident insurance that provides health benefits, and any other similar insurance benefits, except life insurance benefits available to the claimant, whether purchased by him or provided by others; or (2) any contract or agreement of any group, organization, partnership or corporation to provide, pay for or reimburse the costs of hospital, medical, dental or other health care services. 'Collateral sources' do not include amounts received by a claimant as a settlement."

[16] Public Act 86-338, § 3 (modifying General Statutes § 52- 572h [c]). See footnote 9 of this opinion.

Reform I, to make the operative criterion of a cause of action's accrual the date of the injury, rather than the date the injury is discovered.

The trial court rejected the defendants' argument, relying on an Appellate Court decision that held the new definition of collateral sources applicable to cases in which injury occurred between October 1, 1986, and October 1, 1987. See *Bower* v. *D'Onfro*, 38 Conn. App. 685, 696–701, 663 A.2d 1061, cert. denied, 235 Conn. 911, 912, 665 A.2d 606 (1995), modified, 45 Conn. App. 543, 696 A.2d 1285 (1997). In *Bower*, the Appellate Court construed the redefinition of collateral sources in Tort Reform II as a clarification of the definition in Tort Reform I. Id. As a clarification, Tort Reform II could be applied retroactively. *Toise* v. *Rowe*, 243 Conn. 623, 628, 707 A.2d 25 (1998); *State* v. *Magnano*, 204 Conn. 259, 284, 528 A.2d 760 (1987). We disagree with the analysis in *Bower*.

To hold that the excision of specific statutory language by an amendatory statute constitutes a clarification would, in effect, give retroactive effect to every statutory amendment. Our cases do not go that far. They focus on clarification of ambiguous language. See *Toise* v. *Rowe*, supra, 243 Conn. 631 (need for clarification arose from statutory ambiguity manifested in ongoing controversy); *State* v. *Magnano*, supra, 204 Conn. 283. The plaintiff does not and cannot argue that the language of § 5 of Tort Reform I was ambiguous. That section provides that collateral sources include "any payments made to the claimant, or on his behalf . . . as compensation for personal injury or wrongful death attributable to the incident giving rise to the cause of action . . . ." Public Act 86-338, § 5. In Tort Reform II, by contrast, the legislature expressly excluded settlements from "collateral sources."[17]

---

[17] See footnote 15 of this opinion.

Furthermore, a substantive change, even though described as technical in nature, is not automatically a clarification of a prior unambiguous statute. A legislative decision to correct prior statutory misstatements is not, alone, evidence of an intent to clarify. In the absence of a showing of ambiguity, it would require an extraordinarily explicit and clear legislative history to demonstrate a legislative intent to clarify language such as that contained in § 5 of Tort Reform I.

The legislative history of Tort Reform II is far from explicit about an intent to clarify rather than to correct § 5. Senator Thomas F. Upson explained the effect of Tort Reform II as follows: "With the passage of [Tort Reform II], we'll now have, for a period of time, three standards, three different sets of . . . laws pertaining to wrongful death actions and personal injury actions . . . . One, that occurred before October 1st, 1986. One, that occurred after October 1st, 1986. And then October 1st, 1987." 30 S. Proc., Pt. 6, 1987 Sess., p. 1969. Representatives Robert Farr and Richard D. Tulisano considered an example in which an injury that occurred before the effective date of the apportionment provisions of Tort Reform II resulted in a wrongful death after Tort Reform II became effective. The representatives concluded that the law in effect at the time that the injury occurred would control a legal action. Remarks of Representatives Farr and Tulisano, 30 H.R. Proc., Pt. 16, 1987 Sess., pp. 5680–81.

The dissent relies on statements made by Senator Anthony V. Avallone and Representative Robert G. Jaekle. It is undisputed that Tort Reform II was enacted to correct errors in Tort Reform I. What is at issue, however, is whether the correction in the apportionment provision of Tort Reform II was intended to be retroactive because it was a clarification rather than a better approach for future cases. We read Representative Jaekle's statement as indicative of an intent to make

tort reform more workable and not as a clarification of the specific language of Tort Reform I.

Understandably, therefore, the plaintiff does not place heavy weight on legislative clarification. He maintains, instead, that a cause of action for negligence does not accrue until the injured party knew or should have known of a causal relationship between a tortfeasor's negligence and the harm caused thereby. See *Champagne* v. *Raybestos-Manhattan, Inc.*, supra, 212 Conn. 520–21. We have applied this same principle in the context of cases construing the statute of limitations. *Barnes* v. *Schlein*, 192 Conn. 732, 738–39, 473 A.2d 1221 (1984); *Burns* v. *Hartford Hospital*, 192 Conn. 451, 460, 472 A.2d 1257 (1984). Because the plaintiff's cause of action in this case was not discovered until some time after the enactment of Tort Reform II, the plaintiff argues that the trial court correctly relied on the collateral source provisions contained in that statute rather than those contained in Tort Reform I.

In the present case, we need not decide whether, in the abstract, an action accrues under Tort Reform I when an injury occurs or when it is discovered. We look instead to the purpose and intent of the legislature in enacting the two tort reform statutes. Well established principles of statutory construction support the defendants' position that this case is governed by Tort Reform I. "Our fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omitted.) *State* v. *Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994).

In light of the legislature's manifest purpose to reform the law of negligence, we read the effective dates of Tort Reform I and Tort Reform II as having been intended to create a workable scheme of transition between the two statutes. Earlier in this opinion, we followed *LeConche* v. *Elligers*, supra, 215 Conn. 707, concluding that the apportionment provisions of Tort Reform II, rather than repealing Tort Reform I, amended the earlier statute only with regard to injuries occurring after the effective date of Tort Reform II. Accordingly, this case must be governed by Tort Reform I.

We conclude, therefore, that the trial court improperly relied on the collateral sources provisions of Tort Reform II. Its judgment, therefore, must be reversed in part to allow recalculation of the liability of each defendant to take into account the amount of the hospital's settlement with the plaintiff.

## V

We address next the issues raised solely by the cross appeal of the defendant Alcan. Apart from the issues concerning statutory tort reform, Alcan challenges the propriety of the trial court's charge to the jury and the trial court's denial of the evidentiary claims raised in his motion to set aside the verdict. We are persuaded by none of Alcan's claims.

## A

With respect to the issue of jury instructions, Alcan claims that the trial court improperly: (1) instructed the jury on the caretaker standard; and (2) failed to instruct the jury concerning the alleged liability of non-party providers of medical care for the child. Neither argument warrants extensive discussion, because neither was properly raised in the trial court.

One issue before the jury was whether consent for surgery would have been given on the child's behalf if

such surgery had been undertaken before her heart defect became inoperable. The trial court instructed the jury that the relevant consent-giver was a reasonable caretaker, rather than the members of the child's family. The merits of that instruction are not properly before us. At trial, Alcan voiced no exception to the jury charge, filed no contrary request to charge and raised no argument in his motion to set aside the verdict. We decline to entertain his argument at this late date. See Practice Book § 60-5.[18]

In his alternate challenge to the trial court's jury instructions, Alcan claims that the court was required to ask the jury to respond to an interrogatory concerning his allegation that other medical care providers, who were not parties to this litigation, might bear responsibility for the child's injury.[19] Specifically, Alcan suggests that the jury should have been permitted to consider the possible liability of certain emergency room physicians at Stamford Hospital and radiologists at Stamford Hospital and St. Joseph's Hospital. The radiologists took chest X rays of the child and the physicians examined her in the Stamford Hospital emergency room.

The trial court denied Alcan's request for an interrogatory charge because, inter alia, the plaintiff had not received fair notice of Alcan's intent to raise such an issue. The plaintiff relied on Alcan's failure, at trial, to provide any notice that he would seek to have the jury consider Stamford Hospital's alleged negligence when

---

[18] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ."

[19] Alcan asserts that he was entitled to the instruction on negligence of nonparties because he submitted a proposed interrogatory regarding the liability of other persons. Alcan's assertion is inaccurate, however, because his interrogatory refers to the superseding negligence of other parties or persons, not to apportioning liability.

the jury apportioned liability. Alcan has not responded, by citation or otherwise, to the plaintiff's factual assertion. In the absence of any such rebuttal, there is no foundation for Alcan's claimed entitlement to an interrogatory charge on this subject.

## B

Alcan also argues that the trial court should have granted his motion to set aside the verdict because: (1) the verdict was inconsistent; and (2) the evidence at trial failed to include sufficient evidence of proximate cause.[20] These arguments, too, are unpersuasive.

Alcan maintains that the trial court should have set the jury verdict aside because, in his view, the jury verdict was inconsistent. The alleged inconsistency arises out of the jury's finding that Alcan, although not negligent with respect to the child's 1986 cardiogram, had departed from the applicable standard of care with respect to the 1987 cardiogram.

Alcan cannot prevail on this claim. Procedurally, the claim is flawed because it was not raised clearly at trial. See Practice Book § 60-5.[21] Substantively, the claim cannot succeed because, among other things, the jury could have found decisive Alcan's 1987 failure to describe the child's condition as "abnormal," when he had done so in the previous year. Furthermore, the passage of another year without improvement in the condition manifested in the cardiogram supported the jury's finding of Alcan's malpractice in 1987.

Alcan also maintains that the trial court should have set the jury verdict aside because there was no evidence

[20] In deciding the merits of a claim of evidentiary insufficiency, this court, since 1978, has looked to "the evidence and the pleadings in the whole record," not merely to the evidence reproduced in the appendices to the briefs, as Alcan contends. See *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

[21] See footnote 20 of this opinion.

that his malpractice with respect to the 1987 echocardiogram report had caused injury to the child. We disagree.

The plaintiff introduced evidence that Alcan's malpractice delayed the diagnosis of the child's heart defect until a time when the defect had become inoperable. The plaintiff's experts testified that the child's pulmonary disease was not yet irreversible in April, 1987, because her heart defect could have been repaired surgically at that time. When her condition was diagnosed, belatedly, the window of opportunity for successful surgical intervention had closed.

Alcan argues, however, that, to prove causation, the plaintiff was required to show that the child's primary care physicians reasonably relied on Alcan's report concerning the 1987 cardiological examination. The plaintiff introduced two kinds of evidence to demonstrate causation. He produced expert testimony that a cardiologist has an affirmative duty to communicate orally with primary care physicians. He also produced the testimony of the child's primary care physician that he had, in fact, relied on the contents of Alcan's written reports. In the circumstances of this case, the alleged unreasonableness in that reliance was, at best, a question of fact for the jury, a fact that the jury found for the plaintiff.

Alcan maintains that this proof of causation was insufficient in the absence of expert testimony expressly stating that Alcan's deviation from the applicable standard of care was a proximate cause of the child's injuries. On the present record, that claim cannot be sustained. The plaintiff's experts testified about the consequences of Alcan's failure to warn anyone about the child's serious condition: she did not receive surgical care at a time when her condition could have been

remedied. The jury reasonably could have found a proximate as well as an actual linkage between Alcan's negligence and the child's present pulmonary disease with its foreseeable catastrophic consequences.

We conclude, therefore, that the trial court properly denied Alcan's motion to set aside the jury verdict. That conclusion is buttressed by our customary deference to such a decision by the trial court. See *Marchetti* v. *Ramirez*, 240 Conn. 49, 56, 688 A.2d 1325 (1997) ("[t]he trial court's refusal to set aside the verdict . . . is entitled to great weight and every reasonable presumption should be given in favor of its correctness" [internal quotation marks omitted]); *Childs* v. *Bainer*, 235 Conn. 107, 113, 663 A.2d 398 (1995).

## VI

The present case provides yet another example of the ever changing relationship between our common law and our statutory law. Applying the principles of the common law, we affirm the judgment of the trial court accepting the jury's verdict that the defendants were negligent and that their negligence proximately caused the child's injury. Applying the principles of the statutory law contained in Tort Reform I, we conclude that each defendant, including the treating hospital, bears proportional responsibility for payment of damages to her. Applying that same statute, we further conclude that the damages awarded in the present case must reflect moneys that the plaintiff received in a pretrial settlement with the hospital at which the child's primary care physicians worked. The judgment of the trial court must be affirmed, therefore, except for its refusal to subtract the hospital's settlement amount from the damages to be apportioned among the defendants. The damages awarded in the judgment must, accordingly, be recalculated.

The judgment is reversed only with respect to the apportionment of liability for the damages award and the case is remanded to the trial court for recalculation of the amount of damages owed by each of the defendants.

In this opinion BORDEN and NORCOTT, Js., concurred.

MCDONALD, J., with whom BERDON, J., joins, concurring in part and dissenting in part. We agree with the majority opinion except as to part IV.

This case demonstrates that the collateral source credit provision of Tort Reform I can lead to unforeseen and unfair results. In apportioning liability in this case, the jury found that St. Joseph's Hospital (hospital) was 65 percent responsible for the plaintiff's injuries, while each of the two doctors, Yap and Alcan, was 17.5 percent responsible. The jury also found that the plaintiff suffered $2,315,000 in damages. Under the majority's holding, the hospital's pretrial settlement with the plaintiff in the amount of $1,300,000 is deducted from the damage award, further decreasing the plaintiff's recovery. The plaintiff will receive $355,250 from both Yap and Alcan (35 percent of $2,315,000 minus $1,300,000), instead of $810,250 (35 percent of $2,315,000), $455,000 *less* then the amount the jury intended to award. Here, the defendants' apportioned share is reduced by the amount the jury found that the hospital ought to pay, and the majority decision further reduces the verdict amount by the settlement actually paid by the hospital. This provides the doctors with a double credit that constitutes a windfall. Yap and Alcan benefit doubly.

The majority refuses to apply the 1987 amendment to the collateral source provision of Tort Reform I in this case. That amendment explicitly provides that " '[c]ollateral sources' do not include amounts received by a claimant as a settlement." Public Acts 1987, No.

87-227, § 5, now codified at General Statutes § 52-225b. I would uphold the decision of the trial court and apply in this case the 1987 amendment to the Tort Reform I definition of collateral sources.[1]

While discussing the 1987 amendment, Senator Anthony V. Avallone stated that "[i]t was found that settlements, when a party agrees before trial, that it will take a certain amount of money and release the other party from all exposure, that is the settlement. And it was found in last year's bill that that could be determined to be a collateral source, and thereby deductible from the judgment. All parties agreed that was a double shot at the victim. It wasn't fair. It has been eliminated." 30 S. Proc., Pt. 6, 1987 Sess., pp. 1939–40. Characterizing the act as it read as "technically flawed" and "absolutely unworkable"; id., p. 1932, remarks of Senator Avallone; the legislature also amended Tort Reform I by deleting from the definition of collateral sources "payments made . . . by any person as compensation for personal injury or wrongful death attributable to the incident giving rise to the cause of action . . . ." Public Acts 1986, No. 86-338, § 5. The deletion and the explicit exclusion were meant to clarify the original intent of the legislature in defining collateral sources. This was evidenced by the remarks of Senator Thomas F. Upson, who, referring to the collateral source provision of the 1987 amendment, stated: "I believe this is a technical correction." 30 S. Proc., supra, p. 1963. During a later debate in the House, Representative Robert G. Jaekle referred to "technical changes that made sense, that clarified intent, that made [Tort Reform I] more workable." 30 H.R. Proc., Pt. 16, 1987 Sess., p. 5733.[2]

---

[1] The majority finds the deleted language unambiguous. See part IV of the majority opinion. If so, one might question why the legislature not only deleted the language, but also *explicitly* excluded settlements.

[2] Representative Jaekle spoke in opposition of the 1987 amendment, disagreeing with changes to the joint and several liability provisions of Tort

When the legislature acted in 1987, it did not expressly state that the 1987 amendment should apply retroactively. However, well established principles of statutory construction "require us to construe a statute in a manner that will not thwart its intended purpose or lead to absurd results." *Turner* v. *Turner*, 219 Conn. 703, 712, 595 A.2d 297 (1991). In determining whether the exclusion of settlements from the collateral source provision of Tort Reform I was intended to apply retroactively, we must "look to the history of [the] enactment [of the 1987 amendment], to the mischief it was designed to remedy, and to the underlying policy it was intended to serve, to determine what purposes the legislature sought to achieve." Id., 713.

In this case, the legislative history clearly indicates that interpretation of the original language of Tort Reform I led to unfair results. The aim of tort reform was not to benefit tortfeasors doubly, but to allocate the burden of fairly compensating injured parties among tortfeasors according to the degree of their relative responsibility. Nothing could be further from the intent of the legislature than the result reached by the majority in this case.

When the legislature is clarifying prior legislation, the correction has retroactive effect. "According to well established principles of statutory construction, an amendment that construes and clarifies a prior statute operates as the legislature's declaration of the meaning of the original act." Id., 717; accord *Tax Commissioner* v. *Estate of Bissell*, 173 Conn. 232, 246, 377 A.2d 305 (1977). "Where an amendment is intended to clarify the original intent of an earlier statute, it necessarily has retroactive effect." (Internal quotation marks omitted.) *Toise* v. *Rowe*, 243 Conn. 623, 628, 707 A.2d 25 (1998).

Reform I, but spoke in favor of the 1987 amendment's "good technical changes." 30 H.R. Proc., supra, p. 5733.

In debating this amendment, the legislators used the very language—"clarified intent"—that we have recognized as giving retrospective effect to legislation. Thus, according to the legislative history, the legislature clearly and unequivocally expressed its intent to apply the legislation retrospectively. See, e.g., *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 40, 43, 699 A.2d 101 (1997); *Reliance Ins. Co.* v. *American Casualty Co. of Reading, Pennsylvania*, 238 Conn. 285, 289–91, 679 A.2d 925 (1996). We would follow that expressed intention and uphold the trial court's application of the 1987 amendment's definition of collateral sources to avoid a double credit for the defendants.

Accordingly, we concur in parts I, II, III and V and respectfully dissent from part IV of the majority opinion.