[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
 I. Statement of Case
This is an administrative appeal from a revised declaratory ruling of the State of Connecticut, Department of Consumer Protection, issued jointly by the Heating and Cooling Examining Board and the Plumbing and CT Page 6686 Piping Work Examining Board ("Boards"). The plaintiff, Abington Constructors, Inc., had filed a petition for a declaratory ruling pursuant to General Statutes § 4-176 seeking the Boards' interpretation of the meaning of "installation" as used in General Statutes § 20-330 (3) and (5).[1] This appeal is brought pursuant to General Statutes §§ 4-183 and 20-336.[2]
 II. Procedural History
The plaintiff is a heavy industrial construction company, which has performed civil and mechanical construction work in the State of Connecticut. The defendant examining Boards are established within the Department of Consumer Protection pursuant to General Statutes §20-331. The powers and duties of the Boards include the authority to "adopt regulations . . . for the pursuit, practice and standards of the occupations within the jurisdiction of the boards for the preservation of the public safety. . . . [A]dopt regulations . . . to establish the amount and type of experience and training required to qualify an applicant for an examination for any license. . . . [D]etermine the specific area of a trade for which limited licenses shall be issued and the areas for which no license shall be required." General Statutes § 20-332 (b).
Through petition for declaratory ruling dated May 11, 1995, the plaintiff posed four questions to the Boards seeking a declaratory ruling on whether certain specifically enumerated types of work constituted "installation" for the purposes of General Statutes § 20-330 (3) and (5), thereby requiring that it be performed by a licensed tradesman.[3]
In response to the petition, the Boards jointly conducted an administrative hearing to receive evidence and discuss the pertinent issues. On or about September 29, 1995, the Boards issued a declaratory ruling. The ruling addressed the four questions posed by the plaintiff and included both findings of fact and conclusions of law.
The plaintiff appealed to the Superior Court from the declaratory ruling by petition dated November 9, 1995. The court, McWeeny, J., issued a comprehensive and well reasoned written decision dated December 17, 1996,[4] which stated in relevant part:
 Abington appeals arguing that the boards' interpretation of "installation" violates the equal protection clauses of the United States and Connecticut constitutions because it unreasonably prevents non-licensed laborers from performing the work of their trade. The boards' findings are insufficient for the court to determine if a rational CT Page 6687 basis for or a legitimate governmental interest is served by their rulings; thus, the appeal is sustained and the case remanded for further proceedings. (Abington Constructors v. Dept. of Consumer Protection, supra, 1.)
The court continued:
 The boards' rulings do not present a single definition of "installation" that is applied in all four rulings, an explanation of what safety or other governmental interests are served by this definition, an explanation of how these interests are served by excluding non-licensed tradesmen from handling piping materials, or the reasons for and state interests served by carving out a limited exception for crane operators alone. To avoid improper speculation on these matters by this court, the boards must revisit this case before Abington's equal protection challenge is addressed. After hearing further evidence and argument by Abington and other interested parties, the boards shall issue another declaratory ruling on each of the four questions posed by Abington. In accordance with this decision, the boards' new written rulings shall articulate the basis for their declaratory rulings. (Id., 10-11.)
In accordance with the court's ruling, the Boards on remand conducted an administrative hearing over numerous days, during which a number of witnesses testified and exhibits were introduced. On or about May 17, 2000, the Boards issued a revised ruling. The plaintiff brings this second appeal challenging several aspects of this revised ruling.
 III. Jurisdiction 
A. Aggrievement
General Statutes § 4-183 (a) provides in relevant part that "[a] person . . . who is aggrieved by a final decision may appeal to the Superior Court. . . ." "To be an aggrieved person, one must be affected directly or in relation to a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest such as is the concern of all members of the community, and the appellant must be specially and injuriously affected as to property or other legal rights." Smith v. Planning Zoning Board, 203 Conn. 317, 321 (1987). CT Page 6688
In the present matter, the plaintiff appeals from the Boards' revised declaratory ruling. The defendants in this appeal have not challenged aggrievement. Thus, this court finds that the plaintiff is aggrieved.
B. Timeliness of Appeal
General Statutes § 4-183 (c) provides, in relevant part: "Within forty-five days after mailing of the final decision under § 4-180. . . a person appealing . . . shall serve a copy of the appeal on the agency that rendered the final decision . . . and file the appeal with the clerk of the superior court. . . ." The defendant has not raised a jurisdictional defect. Thus, this court finds the appeal to be timely.
 IV. Standard of Review
"Judicial review of [an administrative agency's] action is governed by the [Uniform Administrative Procedures Act (UAPA)] . . . and the scope of that review is very restricted. . . ." (Citations omitted; internal quotation marks omitted.) Cadlerock Properties v. Commissioner,253 Conn. 661, 668, cert denied, ___ U.S. ___, 121 S.Ct. 1089,148 L.Ed.2d 963 (2001). "The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." General Statutes § 4-183 (j).
 Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . [T]he trial court may [not] retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. General Statutes § 4-183 (j)(5) CT Page 6689 and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . [S]ubstantial evidence . . . is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . .
(Citations omitted; internal quotation marks omitted.) CadlerockProperties v. Commissioner, supra, 253 Conn. 669.
Further, the court must search the entire record to determine whether substantial evidence exists to support the agency's findings of fact, and whether the conclusions drawn from those facts are reasonable. Dolgnerv. Alander, 237 Conn. 272, 283 (1996).
 Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts.
(Citations omitted; internal quotation marks omitted.) CadlerockProperties v. Commissioner, supra, 253 Conn. 669.
 V. Discussion
CT Page 6690
A. The Text of Pertinent Portions of the Revised Ruling
The Boards in their May 2000 revised ruling began by articulating their reasoning for the decision as it related to the administrative record.
 The primary concern of the Boards in administering the occupational licensing statutes is the preservation and enhancement of public safety. See, e.g., Conn. Gen. Stat. § 20-332 (b)(1). The Boards are, therefore, required to construe the term "installation," as it is used in Conn. Gen. Stat. §§ [20-330](3) and (5), in the manner most conducive to safety. The safety with which the Boards are concerned is that of the general public, including but not limited to the intended users of completed plumbing, heating, or cooling projects, as well as that of those present at job sites at which plumbing, heating, and cooling work is performed.
 The manner in which piping material is moved, stored, or otherwise handled at the job site has, in many instances, important safety implications. For example, certain piping material may require special handling to ensure its integrity and proper functioning once it is finally assembled and placed in service. . . .
 Improper handling of such material may result in its defective performance or failure, which, in turn, may create safety hazards. In addition, piping materials are stored at job sites in such a manner as to protect against accidents, damage, or misidentification. The properly licensed individual is best equipped to determine the safest means of moving, storing, and handling such materials. The licensed individual also bears responsibility for, and risks the consequences of, the improper installation of piping material.
 This is not to say, however, that a licensed individual's performance of installation work may never involve a limited delegation of tasks associated with the moving, storing or handling of piping material to an unlicensed subordinate. Indeed, there may be circumstances in which safety is equally or better served by permitting unlicensed individuals to handle piping materials. For example, off-loading of CT Page 6691 piping material as it arrives at a job site might be done most safely by delivery persons who are familiar with the safe operation of their delivery equipment. Similarly, experienced machine operators might be most qualified to safely move heavy piping materials around a job site. There are also occasions where a particular aspect of the handling of piping materials requires minimal knowledge, training or professional judgment and does not, in any way, implicate safety. In such an instance, it would be appropriate for a licensed individual to delegate the task in question to an apprentice or other appropriately qualified subordinate.
 We caution, however, that the delegation of any task associated with the handling of piping material at a job site must be strictly limited. First, any unlicensed individual who handles piping materials pursuant to such a delegation must be under the direct supervision of a properly licensed individual. "Direct supervision," in this context, shall mean that the delegated task is carried out under the guidance and within the sight and/or hearing of a properly licensed person. Adopting this definition of "supervision" ensures that properly licensed individuals will not remove themselves entirely from those aspects of the installation process that they have delegated. Nor will they be permitted to delegate more work than they can properly monitor and direct.
 As further assurance that licensed individuals will not delegate tasks unnecessarily, the class of unlicensed persons to whom tasks may be delegated must be limited to apprentices or other appropriately qualified subordinates. Apprentices are assumed, because of the training associated with the apprenticeship program, to have some understanding of the materials and techniques used in properly performing installation work. Appropriately qualified subordinates may, in certain circumstances, include qualified machine operators, who are trained to safely handle materials with their machines. Barring unusual safety-related circumstances, a non-apprentice laborer would be appropriately qualified to perform the very simple task of moving piping materials from a storage area to a point adjacent to the point of final CT Page 6692 assembly. A non-apprentice laborer would not, however, be appropriately qualified to participate in the process of assembling piping material in preparation for its installation or to handle piping material after it has been delivered from a storage site to an area adjacent to the point of final assembly. The risks and consequences of improperly performing these aspects of the installation process are simply too great.
 More importantly, safety must be the licensee's primary consideration in deciding whether the handling of piping material may be delegated to an unlicensed person. We do not attempt to identify those circumstances in which safety would or would not permit such a delegation. We simply point out the following: if delegating a task associated with the installation process would exert an appreciable, negative impact upon safety, then the licensed individual must personally perform it. If such a delegation would have no negative impact upon safety, then the licensed individual may delegate it, but not without directly supervising its performance. Factors that the licensed individual will have to consider in making such a determination will include the complexity of the task, the nature of the piping material at issue, the risks associated with mistakes or accidents in the performance of the task, and the qualifications and experience of the person to whom the task would be delegated.
(Citations omitted; footnotes omitted.) (Boards Revised Ruling, 4-7)
B. Plaintiff's Claims of Error
The plaintiff in its November 2, 2000 memorandum has raised several claims of error. (1) The Boards' definition of "installation," as it relates to questions one and two in the request for declaratory judgement, violates both Federal and State constitutional guarantees of equal protection of the laws. (2) The definition of "installation," as applied to questions three and four, is arbitrary and irrational, and, therefore, unconstitutional.
C. Applicable Constitutional Standard
In this appeal, the plaintiff contends that the Boards' interpretation CT Page 6693 of General Statutes §§ 20-330 (3) and (5) is unconstitutional because it infringes upon both the Federal and State guarantees of equal protection of the laws. Those constitutional provisions provide in relevant parts as follows: "No state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. "No person shall be denied the equal protection of the law. . . ." Conn. Const., art. I, § 20.
"The equal protection provisions of the federal and state constitutions have the same meaning and limitations." Keogh v. Bridgeport, 187 Conn. 53,66 (1982); Caldor's Inc. v. Bedding Barn, Inc., 177 Conn. 304, 314
(1979). Further, "[w]hen a statute is challenged on equal protection grounds, whether under the United States constitution or the Connecticut constitution, the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard wherein the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. . . . If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate governmental purpose in order to withstand an equal protection challenge. . . ." (Citations omitted; internal quotation marks omitted.)Benjamin v. Bailey, 234 Conn. 455, 477 (1995).
The parties agree that the applicable constitutional standard is the rational basis test. (Plaintiff's November 2, 2000 Brief, pp. 9 et seq.; Defendants' December 18, 2000 Brief, pp. 6 et seq.) "[S]tate action concerning social and economic regulation will survive an equal protection challenge if it satisfies a rational basis test." Daly v.DelPonte, 225 Conn. 499, 513 (1993). Under this test "a statute will stand if the classification bears a reasonable relation to a legitimate state interest." Zapata v. Burns, 207 Conn. 496, 505 (1988). Additionally, "[u]nder rational basis review, this court may not sit as a superlegislature to judge wisdom or desirability or legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines. . . . Instead this strong presumption of legislative validity is overcome only when it plainly appears that the terms of the legislation are not reasonable or that they are not rationally adapted to the promotion of public health, safety, convenience, or welfare. . . . The party challenging the enactment bears the burden of overcoming this presumption." (Citations omitted; internal brackets omitted; internal quotation marks omitted.) Bower v. D'Onfro,38 Conn. App. 685, 694-95 (1995). "There is no doubt that the [State] has CT Page 6694 a right to regulate a business, pursuant to its police power, in the interest of protecting the public safety or the welfare of its inhabitants." Blue Sky Bar, Inc. v. Stratford, 203 Conn. 14, 22 (1987). Finally, a court should "[accord] considerable deference to the construction given a statute by the administrative agency charged with its enforcement. . . ." Sutton v. Lopes, 201 Conn. 115, 120 (1986).
D. Analysis of Plaintiff's Claims of Error
1. The Plaintiff's Claim that the Definition of "Installation" as it Pertains to Questions One and Two Violates Guarantees of Equal Protection of the Law
The Boards, in their revised ruling, determined that the off-loading of piping materials at a job site from delivery vehicles manually or through the use of tools or equipment did not constitute installation under General Statutes §§ 20-330 (3) and (5). "[T]he physical act of moving materials from the delivery vehicle to a safe storage or lay-down area for turn over to the licensed person is not installation. Safe storage or lay-down area shall not, for purposes of this response, be construed to include the point of final installation." (Revised Ruling, p. 9).
In comparison, in responding to question number one, the Boards concluded that the handling or movement of piping materials from job site storage to the point of final assembly through the use of tools or equipment was within the meaning of "installation" as used in General Statutes §§ 20-330 (3) and (5).
 Installation of piping materials must be performed by properly licensed individuals. A licensed individual's performance of piping installation work may, however, involve a limited delegation to an apprentice or appropriately qualified subordinate of the handling or movement of piping materials from storage at the job site to an area adjacent to the point of final installation, but only as safety permits. Once it is delivered to an area adjacent to the point of final assembly, piping material may only be handled by a licensed individual, registered apprentice, or qualified machine operator. A qualified machine operator handling piping material after its delivery to an area adjacent to the point of final assembly may only handle such material through the operation of his or her machine. Any unlicensed individual who handles or moves piping material pursuant to such a delegation must be under the direct supervision of the properly CT Page 6695 licensed individual. . . . "Safety," as it is used herein, refers to the safety of the public, including but not limited to the intended users of the completed project, as well as the safety of those present as the job site.
(Revised Ruling, pp. 8-9).
The Boards stated that the "primary concern . . . in administering the occupational licensing statutes is the preservation and enhancement of public safety." (Revised Ruling, p. 4). The public in this instance includes the job site workers, general public and the intended users of the finished project. (Revised Ruling, p. 4). The Boards found that:
 The manner in which piping material is moved, stored, or otherwise handled at the job site has, in many instances, important safety implications. For example, certain piping material may require special handling to ensure its integrity and proper functioning once it is finally assembled and placed in service. . . .
 Improper handling of such material may result in its defective performance or failure, which, in turn, may create safety hazards. In addition, piping materials are stored at job sites in such a manner as to protect against accidents, damage, or misidentification. The properly licensed individual is best equipped to determine the safest means of moving, storing, and handling such materials. The licensed individual also bears responsibility for, and risks the consequences of, the improper installation of piping material.
(Citations to administrative record omitted) (Revised Ruling, pp. 4-5)
The court finds the Boards' distinction between the off-loading of materials during the delivery process and the subsequent handling of the same materials as they are brought to the point of assembly bears a reasonable relationship to a legitimate state interest, namely, public safety. As was noted earlier, the Boards concluded that improper handling, selection and storage of piping materials may result in "defective performance or failure, which, in turn, may create safety hazards." (Revised Ruling, p. 5). This conclusion was supported by substantial evidence in the record. (See, e.g., Testimony of David J. Woskowicz, Acting Chairman of the Connecticut Fire Protection Sprinkler Systems Work Examining Board, Transcript June 30, 1999, pp. 43-46; Clifton CT Page 6696 O'Donel, President of the Mechanical Contractors Associations of Connecticut, Transcript June 30, 1999, pp. 46-55). The selection of the correct piping materials from storage and the handling of those materials on the job site implicates public safety because it requires a certain set of skills to accomplish the task properly and safely. In contrast, off-loading supply materials from a truck requires another, separate set of skills, namely, commercial truck operation and delivery skills. The Boards recognized this important distinction, stating that the "off-loading of piping material as it arrives at a job site might be done most safely by delivery persons who are familiar with the safe operation of their delivery equipment." (Revised Ruling, p. 5). The Boards concluded that the skills necessary to ensure the selection of the correct piping materials from storage and the handling of those materials on the job site are those which are possessed by a tradesman licensed by the State of Connecticut. Each duty is performed by a separate group of individuals and requires different skills and levels of training.
It is in the interests of the people of the State of Connecticut to have only those persons with the requisite training, experience, and qualifications perform or directly supervise the performance of the tasks identified in the plaintiff's first question. Connecticut General Statutes § 20-333 provides the Department of Consumer Protection with the power to license those individuals who have "furnish[ed] such evidence of competency as the appropriate board . . . shall require," who are of "good moral character," and who have "the requisite skill to perform the work in the trade for which the applicant is applying for a license. . . ." Accordingly, to include the work of question one within the definition of "installation" for the purposes of General Statutes §§ 20-330 (3) and (5) and to exclude the work contemplated in question two from that definition does not violate constitutional guarantees of equal protection because the distinction made bears a rational relationship to a legitimate state interest, the protection of the public safety. The plaintiff's reliance on the legal principle that "[e]qual protection requires `the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged'" is inapplicable be cause the different groups of workers are not similarly situated. (Plaintiff's November 2, 2000 Brief, p. 9).
The plaintiff also takes issue with the requirement that a licensed individual directly supervise delegated work performed by a non-licensed individual. Specifically, the plaintiff takes exception to the Boards' recognition of the sufficiency of independent auditory supervision when they define "direct supervision" to include "sight and/or hearing." (Emphasis added.) (Revised Ruling, p. 6). The Boards noted that "[t]here are also occasions where a particular aspect of the handling of piping materials requires minimal knowledge, training or professional judgment CT Page 6697 and does not, in any way, implicate safety. In such an instance, it would be appropriate for a licensed individual to delegate the task in question to an apprentice or other qualified subordinate." (Footnote omitted.) (Revised Ruling, p. 5). In so delegating, however, "[t]he licensed individual . . . bears responsibility for, and risks the consequences of, the improper installation of piping material." (Revised Ruling, p. 5) Thus, the Board has crafted a system of accountability. Any work that is delegated, must be performed under the direct supervision of the licensed individual, i.e "under the guidance and within the sight and/or hearing of a properly licensed person." (Revised Ruling, p. 9). The plaintiff contends that it "makes absolutely no sense" to permit an unlicensed individual to perform a task within hearing distance of a licensed tradesman. (Plaintiff's November 2, 2000 Brief, p. 14). This argument is unpersuasive because the Boards' definition of "supervision" is intended to "[ensure] that properly licensed individuals will not remove themselves entirely from those aspects of the installation process that they have delegated. Nor will they be permitted to delegate more work than they can properly monitor and direct." (Revised Ruling, p. 6). Thus, the Boards' definition of "direct supervision" requires either visual or auditory distance, in an effort to ensure at least minimal participation in a task by the licensed tradesman. Further, the licensed tradesman has a vested interest in remaining in close contact with those performing delegated tasks because "it remains the responsibility of the licensee to ensure that all aspects of plumbing and piping or heating and cooling work be performed in a competent, workmanlike, and safe manner." (Footnote omitted) (Revised Ruling, p. 8)
2. The Plaintiff's Claim that the Boards' "Sweeping Interpretation" of "Installation" as it Pertains to Questions Three and Four is Arbitrary, Irrational, and Unconstitutional
The Boards determined in connection with question three that "`installation' shall include the assembly of pipe hangers or other supports in connection with piping activity. Considerations of public safety require that these tasks be personally performed by a properly licensed individual." (Revised Ruling, p. 10). The Boards further concluded that the delegation of this work to other unlicensed individuals would not be appropriate due to "the exacting degree of supervision that would be required to ensure the safe assembly and installation of pipe hangers and other supports. . . ." (Revised Ruling, p. 10) This minute degree of necessary supervision makes it more practical for the licensed individual to personally perform these tasks." (Revised Ruling, p. 10).
The Boards determined in response to question four that the "lifting, movement and alignment of piping materials . . . during the assembly CT Page 6698 process" must be performed by a licensed individual. (Revised Ruling, p. 10). The Boards reasoned that "[b]ecause of the delicate and skilled nature of assembling piping material, all aspects of the assembly process must be performed by a properly licensed individual." (Revised Ruling, p. 10). The Boards did, however, indicate that, as safety permits, this work may be delegated "to an apprentice or qualified machine operator" under the direct supervision of a licensed tradesman. (Revised Ruling, pp. 10-11).
The plaintiff contends that the Boards' interpretation of installation as it relates to question three violates guarantees of equal protection because it prohibits "riggers, welders, iron workers and laborers" from participating in the assembly of pipe hangers and other pipe supports. (Plaintiff's November 2, 2000 Brief, pp. 11-12). Moreover, with respect to question four, "the Boards' interpretation of `installation' to include the lifting, movement and alignment of the piping materials by others, whether manually or with tools or equipment, during the assembly process when such work is performed under the direction and control of the properly licensed person is unreasonable, arbitrary, illegal and abuse of discretion because it is not restricted to those operations that only trained plumbers and heating and cooling tradesmen can do, but includes work that is within the ordinary competence and experience of other tradesmen. . . . [T]he Boards' interpretation constitutes an undue and unconstitutional restraint on the equal protection rights of the other qualified tradesmen and Abington who employs them." (Plaintiff's November 2, 2000 Brief, pp. 12-13).
The record contains substantial evidence to affirm the conclusion that the work performed within the scope of questions three and four directly impacts upon public safety. (See, e.g., Testimony of Woskowicz, O'Donel, supra.). In this regard, the Boards stated in part that "[t]he risks associated with improper assembly and installation of pipe hangers and other forms of piping support are obvious and grave." (Revised Ruling, p. 7). Moreover, "[a] non-apprentice laborer would not . . . be appropriately qualified to participate in the process of assembling piping material in preparation for its installation or to handle piping material after it has been delivered from a storage site to an area adjacent to the point of final assembly. The risks and consequences of improperly performing these aspects of the installation process are simply too great." (Revised Ruling, pp. 6-7). The licensed tradesman is trained to perform these categories of work and "it remains the responsibility of the licensee to ensure that all aspects of plumbing and piping or heating and cooling work be performed in a competent, workmanlike, and safe manner." (Footnote omitted) (Revised Ruling, p. 8).
As discussed in reference to questions one and two above, the Boards CT Page 6699 found that some limited delegation of work may be appropriate "to an apprentice or qualified machine operator of the lifting, movement, or alignment of piping materials during the assembly process, but only as safety permits." (Revised Ruling, p. 10) Further, "[a]ny registered apprentice or qualified machine operator who lifts, moves or aligns piping materials during the assembly process pursuant to such a delegation must be under the direct supervision of a properly licensed individual." (Revised Ruling. pp. 10-11).
The State acting pursuant to its police powers may regulate a business or trade to protect the public safety and welfare of its citizens. BlueSky Bar, Inc. v. Stratford, supra, 203 Conn. 22. The Boards determined that licensed tradesman are particularly qualified through their training and experience to perform the work encompassed within questions three and four. These individuals are held accountable for the work, as "it remains the responsibility of the licensee to ensure that all aspects of plumbing and piping or heating and cooling work be performed in a competent, workmanlike, and safe manner. (Footnote omitted) (Revised Ruling, p. 8) Finally, the Boards found that the failure to properly perform this work would adversely impact upon "the safety of the public, including but not limited to the intended users of the completed project, as well as the safety of those present at the job site." (Revised Ruling, p. 11). This court finds that the Boards' definition of "installation" as it relates to questions three and four is rationally related to the public safety and welfare and is supported by substantial evidence in the record. The Boards, pursuant to their statutory composition, possess considerable expertise in the issues under examination. General Statutes §§ 20-331 (c) and (d). Given the rational relationship between the Boards' interpretation and public safety, a legitimate state interest, this court will accord deference to the Boards' construction of the statute.
 VI. Conclusion
For all of the foregoing reasons, the court finds that the Boards' revised ruling does not violate constitutionally guaranteed rights to equal protection of the law and is supported by substantial evidence in the administrative record. Accordingly, the appeal is dismissed.
BY THE COURT:
PETER EMMETT WIESE, JUDGE